CHRISTENSEN, Justice.
*679 On behalf of her mother, Cheryl Albaugh challenges the district court's grant of summary judgment in favor of a "senior adult congregate living facility" as defined in Iowa Code chapter 523D. Iowa Code § 523D.1(11) (2016). She sued the facility after it would not return her mother's entrance fee or supplemental amount when her mother had to vacate the facility for health reasons. Albaugh argued the agreement between her mother and the facility violated Iowa Code chapter 562A, the Iowa Uniform Residential Landlord and Tenant Act (IURLTA). She also presented several other claims, including consumer fraud, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and unconscionability. The district court granted the facility's motion for summary judgment, concluding the IURLTA did not apply to the facility and the facility was entitled to judgment as a matter of law on all other claims. We affirm the district court judgment on appeal for the reasons discussed below.
I. Background Facts and Proceedings.
Cheryl Albaugh holds power of attorney for her mother, Shirley Voumard, a former resident of The Reserve on Walnut Creek (Reserve) from October 2007 to September 2014. The Reserve is a member-owned, nonprofit senior adult congregate living facility in Urbandale, Iowa, that is governed by a board of directors and "offers residents the opportunity to enjoy retirement without the hassle of home ownership." It provides housing and supportive services to its residents with periodic charges in consideration of an entrance fee. These supportive services include various home healthcare services, maintenance, communal activities, security, transportation, and dining options.
To become a member of the Reserve, "an individual or couple must be 60+ years old, of sufficiently good health to live an independent life, and must be able to meet certain minimum financial requirements." Voumard entered into a contract with the Reserve called an "application agreement" (agreement) on September 27, 2007, to obtain a membership interest in the Reserve and the right to occupy a two-bedroom apartment there. Voumard agreed to pay certain fees to cover the Reserve's operation expenses. She agreed to pay a $64,975 entrance fee and a $63,557 supplemental amount upon signing the agreement.[1] She also agreed to pay a varying monthly fee that was originally set at $1078 "in advance of the first day of each succeeding month until such Resident's Residential Membership is transferred as detailed in these Covenants of Occupancy." In doing so, Voumard agreed to pay the monthly charges "until the earlier of (i) the *680 date [her] Residential Membership is transferred as provided in Article 7, or (ii) the date [her] Residential Membership is terminated as provided in Article 12."
This agreement contained the following bold-faced language:
i. Upon disbursement of such Entrance Fee and such Supplemental Amount to the uses and purposes of the Corporation the Corporation will have no further obligation to refund or return such Entrance Fee or such Supplemental Amount to Applicant.
ii. Applicant's ability to recover such Entrance Fee and such Supplemental Amount will depend entirely on the Applicant's ability to assign or transfer his Membership in the Corporation to another person or persons.
iii. The Monthly Charge is subject to fluctuation.
iv. Upon the transfer of Applicant's Membership in the Corporation to another person or persons there is no guarantee the Applicant will recover the entire Entrance Fee, the entire Supplemental Amount, or such other funds as may have accrued during Applicant's residency within the Development pursuant to Article 7 of the Covenants of Occupancy.
v. Should Applicant default under the terms of the Covenants of Occupancy, which default is not cured in a manner deemed satisfactory by the Corporation, Applicant's Residential Membership shall be terminated and all of Applicant's right, title and interest in and to such Entrance Fee, such Supplemental Amount, and such other funds as may have accrued during Applicant's residency within the Development pursuant to Article 7 of the Covenants of Occupancy shall be forfeited by Applicant and become the sole and separate property of the Corporation, and the Corporation shall have the right and authority to transfer Applicant's Apartment to an assignee or transferee. Upon such transfer, the Corporation, in its sole discretion, shall have the right to deduct all Monthly Charges by Applicant and other expenses due and payable upon transfer.
(Emphasis omitted.)
Just above the signature line, the agreement stated, "This Agreement will supersede any prior understandings and agreements and constitutes the entire agreement between us, and no oral representations or statements shall be considered a part hereof." Voumard elected Albaugh as her personal representative on the agreement. Thus, pursuant to the agreement, Albaugh was appointed to receive copies of the agreement, "the [Reserve's] Articles of Incorporation, Bylaws, Covenants of Occupancy and all other notices, disclosures, or forms required to be delivered to [Voumard] under Chapter 523D of the Iowa Code."
In August 2014, the Reserve began contacting Albaugh about Voumard's inability to care for herself. The Reserve contacted Albaugh multiple times, and Voumard was subsequently diagnosed with dementia. After Voumard's doctor determined she could no longer live independently, Albaugh notified the Reserve that Voumard would be vacating her unit as of September 13, in order to move into an assisted living facility.
Albaugh has not sold or transferred Voumard's unit either to a third party or to the Reserve. In accordance with the agreement, the Reserve has continued to bill Voumard pursuant to the agreement after she moved out of the Reserve. Albaugh has requested the Reserve refund Voumard's entrance fee and supplemental amount. The Reserve continues to deny *681 this request. On February 5, 2015, the Reserve sent Albaugh a notice of default informing her that Voumard's rights under the agreement would be terminated and her entrance fee and supplemental amount would be deemed forfeited if Voumard's unpaid charges were not paid within thirty days. Voumard's unpaid charges totaled $5132 at the time the Reserve sent the notice. Albaugh disputed these charges and requested a refund of Voumard's entrance fee and supplemental amount as a rental deposit pursuant to the IURLTA.
In March, the Reserve's elected board of directors announced a change to the Reserve's financial structure due to the increase in "Type A" units the Reserve owned through default or donation. Type A units came with a higher monthly fee than Voumard's "Type B" unit. Due to the Reserve's increase in Type A units, the Reserve allowed these units to be transferred for an entrance fee of $5000. The Reserve did not change the monthly charges for these units, and the board of directors declared, "Please be assured that there will be no 'steering' of prospects away from member-owned units up for transfer, and we'll continue working hard on moving all available units."
The Reserve subsequently implemented a leasing program in July to allow members to lease their units to qualified individuals and to allow the Reserve to lease Reserve-owned units "at market-competitive lease rates." According to the Reserve's marketing director, this program has increased demand and led to a waiting list for units at the Reserve. Though Albaugh communicated with the Reserve's marketing director about marketing and transferring Voumard's membership interest, the record is unclear concerning the extent of these marketing efforts. Since Voumard vacated her unit at the Reserve, Albaugh has repeatedly requested a full refund of Voumard's entrance fee and supplemental amount. The Reserve continues to deny these requests, and it declared Voumard in default on March 8, 2016.
On August 24, Albaugh filed a lawsuit in district court against the Reserve in which she presented seven claims. First, she argued the agreement between Voumard and the Reserve violated the IURLTA. Second, Albaugh claimed the Reserve violated Iowa Code chapter 523D, governing retirement facilities. Third, she alleged the Reserve engaged in consumer fraud in violation of Iowa Code chapter 714H. Fourth, Albaugh maintained the Reserve breached its fiduciary duties to Voumard. Fifth, Albaugh maintained the Reserve breached the implied covenant of good faith and fair dealing. Sixth, she argued Voumard should no longer be held to the terms of her agreement with the Reserve due to impossibility of performance or frustration of purpose. Finally, Albaugh challenged the enforceability of the agreement, claiming it was unconscionable. The Reserve brought in the Essex Corporation as a third-party defendant in its capacity as the former manager of the Reserve to seek indemnity and contribution.
Albaugh filed a motion for partial summary judgment on December 11, 2017, requesting the district court enter judgment that the agreement between Voumard and the Reserve is subject to the IURLTA and relief consistent with that judgment. The Reserve filed a motion for summary judgment on December 20, arguing the agreement is not subject to the IURLTA and challenging Albaugh's other claims as a matter of law. The Essex Corporation filed a motion for summary judgment in which it argued it had no liability to the Reserve to the extent the Reserve had no liability to Albaugh and, alternatively, the undisputed facts fail to establish a basis for a *682 claim of contribution or indemnity as a matter of law.
On May 26, 2018, the district court denied Albaugh's motion for partial summary judgment and granted the Reserve's motion for summary judgment. In doing so, the district court concluded that "the legislature did not otherwise intend for [the IURLTA] to be applicable to an arrangement governed by chapter 523D" and Albaugh's other claims failed to generate any genuine issue of material fact. The district court granted Essex Corporation's motion for summary judgment, noting there was no "need to consider the claims against the [Essex Corporation] ... in the absence of a direct claim by [Albaugh] against the [Reserve]." Albaugh filed a timely notice of appeal on June 14, and we retained the appeal.
II. Standard of Review.
Our review of a district court ruling on a motion for summary judgment is for correction of errors at law. Jahnke v. Deere & Co. , 912 N.W.2d 136, 141 (Iowa 2018). "Summary judgment is proper when the moving party has shown 'there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.' " Id. (quoting Homan v. Branstad , 887 N.W.2d 153, 163 (Iowa 2016) ). We review the district court ruling on any statutory interpretation issues presented in a motion for summary judgment for correction of errors at law. Id.
III. Analysis.
Albaugh presents several claims on appeal. First, she argues the IURLTA applies to the Reserve and requests relief based on the Reserve's alleged violations of the IURLTA. Second, Albaugh claims the Reserve committed consumer fraud. Third, she maintains the Reserve breached its fiduciary duty to Voumard. Fourth, Albaugh proclaims the Reserve also breached the implied covenant of good faith and fair dealing. Finally, she asserts the Reserve's agreement with Voumard was unconscionable.
A. The Applicability of the IURLTA to Retirement Facilities. Albaugh contends the district court erred in granting the Reserve's motion for summary judgment based on its conclusion that the IURLTA is inapplicable to the Reserve and other retirement facilities governed by Iowa Code chapter 523D.
Iowa Code chapter 523D is entitled "Retirement Facilities" and is applicable to a provider who executes a contract for housing and one or more "supportive services" in a facility that "is or will be located in this state" and where the contract "requires or permits the payment of an entrance fee." Iowa Code §§ 523D.1, .2. Some examples of supportive services include activity services, housekeeping, dining options, emergency nursing care, and transportation. Id. § 523D.1(12). As a provider that contracts with residents to supply this sort of housing and living services in an Iowa facility, the Reserve is considered a retirement facility and thus governed by chapter 523D.
On the other hand, "[t]he IURLTA generally defines the legal rights and obligations of a landlord and tenant" in a rental agreement. Lewis v. Jaeger , 818 N.W.2d 165, 178 (Iowa 2012). A " 'rental agreement' means an agreement ... embodying the terms and conditions concerning the use and occupancy of a dwelling unit and premises." Iowa Code § 562A.6(11).
The crux of Albaugh's claim against the Reserve concerning the IURLTA is that Voumard's $64,975 entrance fee and $63,557 supplemental amount should be refunded to Voumard because they are improper *683 rental deposits under the IURLTA. This brings us to the fundamental issue: whether the fees permitted by chapter 523D are rental deposits subject to the IURLTA.
We reconcile Chapter 523D and the IURLTA by considering the rules of statutory construction.[2] See Citizens' Aide/Ombudsman v. Miller , 543 N.W.2d 899, 902 (Iowa 1996) ("The controversy arises only when [the statutes] are jointly brought to bear on the facts.... We therefore proceed to a consideration of the rules of statutory construction."). Under these rules, " '[t]he primary purpose of statutory construction is to determine legislative intent,' gleaned from the words used by the legislature." Simon Seeding & Sod., Inc. v. Dubuque Human Rights Comm'n , 895 N.W.2d 446, 461 (Iowa 2017) (quoting State v. McCoy , 618 N.W.2d 324, 325 (Iowa 2000) (en banc)). To ascertain legislative intent, we examine "the language used, the purpose of the statute, the policies and remedies implicated, and the consequences resulting from different interpretations." Des Moines Flying Serv., Inc. v. Aerial Servs., Inc. , 880 N.W.2d 212, 220 (Iowa 2016) (" '[A] statute should not be interpreted to read out what is in a statute as a matter of clear English' and should not render terms superfluous or meaningless." (quoting 1A Norman J. Singer & Shambie Singer, Statutes and Statutory Construction § 21:1, at 163 (7th ed. 2009))). Further, legislative intent is also derived from the statute's subject matter and object to be accomplished. See Homan , 887 N.W.2d at 166. In doing so, "[w]e assess the entire statute and its enactment to 'give the statute its proper meaning in context.' " Aerial Servs. Inc. , 880 N.W.2d at 220 (quoting Sanon v. City of Pella , 865 N.W.2d 506, 511 (Iowa 2015) ). "We will not consider what the legislature 'should or might have said' when it construed a statute." Homan , 887 N.W.2d at 153 (quoting Iowa R. App. P. 6.904(3)(m ) ("In construing statutes, the court searches for the legislative intent as shown by what the legislature said, rather than what it should or might have said.")).
We now turn to the relevant statutory provisions to determine whether the fees regulated under chapter 523D are subject to the IURLTA. Iowa Code section 523D.1 provides, in relevant part,
4. "Entrance Fee " means an initial or deferred transfer to a provider of a sum of money or other property made or promised to be made as full or partial consideration for acceptance of a specified individual in a facility if the amount exceeds either of the following:
a. Five thousand dollars.
b. The sum of the regular periodic charges for six months of residency.
Iowa Code § 523D.1(4)(a )-(b ). The provision of the IURLTA on which Albaugh relies provides,
12. "Rental Deposit " means a deposit of money to secure performance of a residential rental agreement, other than a deposit which is exclusively in advance payment of rent.
Iowa Code § 562A.6(12). Chapter 562A further defines a rental deposit and states,
*684 1. A landlord shall not demand or receive as a security deposit an amount or value in excess of two months' rent.
....
3. a. A landlord shall, within thirty days from the date of termination of the tenancy ... return the rental deposit to the tenant or furnish to the tenant a written statement showing the specific reason for withholding of the rental deposit or any portion thereof.... The landlord may withhold from the rental deposit only such amounts as are reasonably necessary for the following reasons:
(1) To remedy a tenant's default in the payment of rent or of other funds due to the landlord pursuant to the rental agreement.
(2) To restore the dwelling unit to its condition at the commencement of the tenancy, ordinary wear and tear excepted.
(3) To recover expenses incurred in acquiring possession of the premises from a tenant who does not act in good faith in failing to surrender and vacate the premises ....
Id. § 562A.12(1), (3)(a ).
Affording each statute its proper context, the words used by the legislature reflect the intent to regulate two entirely distinct living arrangements. Chapter 523D regulates facilities that provide housing together with supportive services. In contrast, chapter 562A pertains to the rights and obligations of a landlord and tenant. This distinction is made plain by what the legislature said in each definition. An entrance fee only qualifies as an entrance fee if the amount exceeds "five thousand dollars" or "[t]he sum of the regular periodic charges for six months of residency" and is used as consideration for acceptance in a facility. Id. § 523D.1(4)(a )-(b ). A rental deposit, however, is limited to "two months' rent" and may only be used to remedy the tenant's default, to restore the dwelling unit to its prior condition, and to recover expenses associated with the recovery of the premises. Id. § 562A.12(1), (3)(a ). This reasonably demonstrates the legislature did not contemplate the use of an entrance fee as a rental deposit because the statutory definition of entrance fee is neither constrained to two months' rent nor restricted as a landlord's remedial function.
We conclude the plain statutory language makes clear the legislature did not intend the fees permitted by chapter 523D be subject to the rental deposit provision of the IURLTA. See Ryan v. Maryann Morse Healthcare Corp. , No. 1681CV02433A, 2018 WL 6424841, at *5 (Mass. Super. Ct. Jan. 9, 2018) (concluding the legislature did not intend assisted living facilities be subject to the security deposit statute governing aspects of the landlord-tenant relationship). But see Hennessy v. Brookdale Senior Living Cmtys. Inc. , No. 1784CV04215BLS2, 2018 WL 4427020, at *2 (Mass. Super. Ct. Aug. 1, 2018) (determining the assisted living resident agreement "is in part a residential lease and is therefore, to that extent, subject to" the rights and duties of a residential landlord and tenant pertaining to security deposits). Accordingly, the district court did not err in granting the Reserve's motion for summary judgment based on the inapplicability of the IURLTA.
B. Consumer Fraud. Albaugh maintains the district court erred in granting the Reserve's motion for summary judgment on her consumer fraud claim under Iowa Code chapter 714H. Iowa Code section 714H.3(1) provides,
A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, *685 fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise ....
An "unfair practice" is "an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces." Id. § 714H.2(9). The statute broadly defines "merchandise" to include "objects, wares, goods, commodities, intangibles, securities, bonds, debentures, stocks, real estate or services." Id. § 714H.2(6).
Albaugh claims the Reserve committed consumer fraud in 2015 by prioritizing the sale of the units it held for a low entrance fee and later leasing units to residents without an entrance fee or supplemental amount. According to Albaugh, these practices were unfair because Voumard entered into the agreement with the understanding that the Reserve would refund her entrance fee and supplemental amount and no one informed Voumard that the Reserve would begin leasing or selling units in this manner. Nevertheless, the agreement between Voumard and the Reserve clearly states otherwise. The agreement stated,
Upon the transfer of Applicant's Membership in the Corporation to another person or persons there is no guarantee the Applicant will recover the entire Entrance Fee, the entire Supplemental Amount, or such other funds as may have accrued during Applicant's residency within the Development ....
Further, Albaugh does not point to, nor does the record contain, evidence that the Reserve engaged in a practice that it knew or should have known was unfair under section 714H. Notably, Albaugh omits the knowledge element from her brief entirely in explaining the statute. In any event, Albaugh's argument that a reasonable jury could find the Reserve's actions unfair and "rely on its own common sense" to support this conclusion does not demonstrate that the Reserve knew or should have known it was engaging in an unfair practice. There is no evidence that the Reserve knew in 2007-when Voumard entered her agreement with the Reserve-that it would have to lower the price on entrance fees in 2015. Thus, the district court correctly granted the Reserve's motion for summary judgment on this claim.
C. Breach of Fiduciary Duty. Albaugh challenges the district court's decision to grant the Reserve's motion for summary judgment on her breach of fiduciary duty claim based on its conclusion that Albaugh "failed to identify a factual basis upon which a fiduciary relation could exist." Albaugh argues the Reserve owed a fiduciary duty to Voumard because Voumard relied on the Reserve to protect the value of her membership. The existence of a fiduciary relationship "turns on the facts of the case," and "may, in some cases, be decided by the court in a summary-judgment proceeding." Cemen Tech, Inc. v. Three D Indus., L.L.C. , 753 N.W.2d 1, 13 (Iowa 2008). The term "fiduciary duty" is "very broad," as it "embrac[es] both technical fiduciary relations and those informal relations which exist wherever one man trusts in or relies upon another." Id. (quoting Kurth v. Van Horn , 380 N.W.2d 693, 695 (Iowa 1986) ).
A fiduciary relationship "exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of *686 the other." Id. (quoting Kurth , 380 N.W.2d at 695-96 ). Indicative factors of a fiduciary relationship
include the acting of one person for another; the having and the exercising of influence over one person by another; the reposing of confidence by one person in another; the dominance of one person by another; the inequality of the parties; and the dependence of one person upon another.
Weltzin v. Cobank, ACB , 633 N.W.2d 290, 294 (Iowa 2001) (quoting Kurth , 380 N.W.2d at 696 ). In contrast, a fiduciary relationship does not exist when the relationship exists through an "arms-length transaction," which is "[a] transaction between two unrelated and unaffiliated parties" or "[a] transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises." Arms-length Transaction , Black's Law Dictionary (10th ed. 2014); see also Pirkl v. Nw. Mut. Ins. , 348 N.W.2d 633, 635 (Iowa 1984) (holding there was no clearly defined fiduciary duty in an arms-length relationship).
The district court correctly granted the Reserve's motion for summary judgment on this issue because Voumard and the Reserve engaged in an arms-length transaction that did not establish a fiduciary relationship. The record demonstrates that Voumard and the Reserve entered into the agreement as unrelated and unaffiliated parties. The indicative factors of a fiduciary relationship are not present here, as Voumard and the Reserve negotiated and entered the agreement on equal footing without the Reserve having any form of influence over Voumard. See Weltzin , 633 N.W.2d at 294. Moreover, despite Albaugh's claim that Voumard put her confidence in the Reserve to protect her entrance fee and supplemental amount, we have already noted the application agreement between Voumard and the Reserve stated there was "no guarantee [Voumard] will recover the entire Entrance Fee, the entire Supplemental Amount, or such other funds as may have accrued during [her] residency within the Development." Overall, nothing in the record supports Albaugh's claim that a fiduciary relationship existed between the parties.[3] The district court correctly granted the Reserve's motion for summary judgment on this issue.
D. Breach of Implied Covenant of Good Faith and Fair Dealing. Albaugh contends the district court erred in granting the Reserve's motion for summary judgment on her breach-of-implied-covenant-of-good-faith claim. Albaugh claims Voumard had a justified expectation that future residents would have to pay entrance fees like she did to become a resident, and the Reserve breached this expectation when it reduced the prices of the Reserve-owned units and later offered lease options to prospective residents without an entrance fee. An implied covenant of good faith and fair dealing is inherent in all contracts. Alta Vista Properties, LLC v. Mauer Vision Ctr., PC , 855 N.W.2d 722, 730 (Iowa 2014). "The underlying principle is that there is an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. (quoting Am. Tower, L.P. v. Local TV Iowa, L.L.C. , 809 N.W.2d 546, 550 (Iowa Ct. App. 2011) ). This implied covenant "does not give rise to new substantive terms that do not otherwise exist in the contract." Id. at 731 *687 (quoting Bagelmann v. First Nat'l Bank , 823 N.W.2d 18, 34 (Iowa 2012) ).
Here, no terms exist in the agreement to support Albaugh's argument that the Reserve breached an implied covenant of good faith and fair dealing. Nothing in the agreement suggested the Reserve would enable Voumard to recover her entrance fee or supplemental amount. Rather, the agreement explicitly stated that Voumard's ability to recover these fees "will depend entirely on [Voumard]'s ability to assign or transfer [her] Membership in the Corporation to another person or persons." Consequently, "any allegation of bad faith here lacks a contract term to which it can be attached." Bagelmann , 823 N.W.2d at 34 (declining to find a breach of the implied covenant of good faith and fair dealing when a mortgagee did not promptly provide mortgagors with updated and more accurate flood zone information determinations because nothing in the mortgage contained a promise to provide this information). We affirm the grant of summary judgment to the Reserve on this issue.
E. Unconscionability. Albaugh proclaims the district court erred in granting the Reserve's motion for summary judgment on her unconscionability claim. She points to a number of provisions in the agreement that she believes are unconscionable. Some of these claims rely on the application of the IURLTA, and we need not examine them further given our holding that the IURLTA does not apply to the Reserve.
"A contract is unconscionable where no person in his or her right senses would make it on the one hand, and no honest and fair person would accept it on the other hand." C & J Vantage Leasing Co. v. Wolfe , 795 N.W.2d 65, 80 (Iowa 2011). "Whether an agreement is unconscionable must be determined at the time it was made." Bartlett Grain Co., LP v. Sheeder , 829 N.W.2d 18, 27 (Iowa 2013). "[W]e examine factors of 'assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness' " to determine whether a contract is unconscionable. Id. (quoting C & J Vantage , 795 N.W.2d at 80 ). Nevertheless, "the doctrine of unconscionability does not exist to rescue parties from bad bargains." Id. (quoting C & J Vantage , 795 N.W.2d at 80 ).
We generally recognize procedural and substantive unconscionability. Id. Procedural unconscionability "includes the existence of factors such as 'sharp practices[,] the use of fine print and convoluted language, as well as a lack of understanding and an inequality of bargaining power.' " Id. (alteration in original) (quoting In re Marriage of Shanks , 758 N.W.2d 506, 515 (Iowa 2008) ). Substantive unconscionability "includes 'harsh, oppressive, and one-sided terms.' " Id. (quoting In re Marriage of Shanks , 758 N.W.2d at 515 ).
Albaugh maintains the agreement between Voumard and the Reserve was substantively unconscionable, yet she presents no evidence to demonstrate the agreement was unconscionable at the time Voumard and the Reserve entered into it. The agreement did not contain any elements of unfair surprise, as it clearly informed Voumard of her payment obligations regardless of whether she was still occupying her unit. See id. It provided her with explicit notice that her ability to recover the entrance fee and supplemental amount depended entirely on her ability to assign or transfer her membership interest to someone else, and Voumard assented to the terms of the agreement. See id. Nothing in the record suggests Voumard was unable to understand what she was assenting to.
Further, as we have already noted, Voumard and the Reserve entered into the agreement on equal footing, so there was *688 not a disparity of bargaining power. See id. Despite Albaugh's claim that the agreement is so "harsh, oppressive, and one-sided" that "no man in his senses and not under delusion would make" it, there was a waiting list for certain types of units at the Reserve when Voumard joined. In re Marriage of Shanks , 758 N.W.2d at 514-15 (first quoting Rite Color Chem. Co. v. Velvet Textile Co. , 105 N.C.App. 14, 411 S.E.2d 645, 648 (1992) ; and then quoting Casey v. Lupkes , 286 N.W.2d 204, 207 (Iowa 1979) ). In fact, a motivating factor in Voumard's decision to enter her agreement with the Reserve was that Albaugh's mother-in-law was already a member there. Finally, we note Iowa Code chapter 523D expressly allows the entrance fee and supplemental amount outlined in the Reserve's agreement. See Iowa Code §§ 523D.2, .3, .6. Considering these factors, we affirm the district court's decision to grant summary judgment in favor of the Reserve.
IV. Conclusion.
For these reasons, we affirm the judgment of the district court.
AFFIRMED.
All justices concur except Appel and Wiggins, JJ., who dissent, and Cady, C.J., who takes no part.

The supplemental amount was paid to lower Voumard's monthly fee. The supplemental amount and the monthly fee, in combination, are intended to cover Voumard's proportional share of the costs incurred by the Reserve. The monthly fee is set by the Reserve's board of directors, a majority of whom are elected by the members. Where a resident has paid a supplemental amount, the board must "fairly and equitably account for" the supplemental amount in establishing that resident's monthly fee. The agreement also states that "[n]o resident shall be charged with more than his/her proportionate share thereof as determined by the Board of Directors."

Considered separately, chapter 523D and the IURLTA are not ambiguous. When the meaning of a statute contains no ambiguity, "the statute will be applied in accordance with its plain meaning." Citizens' Aide/Ombudsman v. Miller , 543 N.W.2d 899, 902 (Iowa 1996). However, because Iowa Code § 523D.7(5) states, "[t]his chapter does not limit a liability which may exist by virtue of any other statute or under common law if this chapter were not in effect," it does not preempt the application of other statutes. As a result, any latent conflict must be resolved through the rules of statutory construction. Miller , 543 N.W.2d at 902.

The Reserve was managed by a board of directors, a majority of whom were elected by all members, including Voumard. The directors owed a fiduciary duty to act for the benefit of the Reserve, not an individual member.