**IN THE COURT OF APPEALS OF IOWA**

No. 18-2131
Filed March 18, 2020

**MARY JANE BUCK; LOIS ERBSTEIN; DONALD AND LORRAINE SHIRK; and MAUREEN D. WILSON, Individually and as Trustee of the MAUREEN D. WILSON REVOCABLE TRUST,**
    Plaintiff-Appellees/Cross-Appellants,

**vs.**

**THE RESERVE, A NONPROFIT CORPORATION d/b/a THE RESERVE ON WALNUT CREEK,**
    Defendant-Appellant/Cross Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Jeanie K. Vaudt, Judge.


        The Reserve appeals an adverse judgement on the plaintiffs' claims of

breach of fiduciary duty and unconscionable contract; the plaintiffs cross-appeal

the dismissal of other claims. **REVERSED ON APPEAL; AFFIRMED ON CROSS-**

**APPEAL.**


        William J. Miller of Dorsey & Whitney LLP, Des Moines, for appellant.

        Jason M. Craig and Maria E. Brownell of Ahlers & Cooney, P.C., Des

Moines, for appellee.


        Heard by Bower, C.J., and Greer and Ahlers, JJ.

**BOWER, Chief Judge.**

The Reserve on Walnut Creek (the Reserve) appeals an adverse judgment on the plaintiffs' claims of breach of fiduciary duty and unconscionable contract; the plaintiffs cross-appeal the dismissal of other claims. Our supreme court recently decided an almost identical case involving another member of the Reserve, the same legal representatives, and very similar claims. *Albaugh v. The Reserve*, 930 N.W.2d 676 (Iowa 2019).[1] Because we are bound by that ruling, we reverse and remand for dismissal on the Reserve's appeal. We affirm the entry of summary judgment on the plaintiffs' additional claims.

**I. Background Facts and Proceedings.**

The Reserve is a member-owned, nonprofit "senior adult congregate living facility"[2] in Urbandale, Iowa, governed by a board of directors. It provides housing and supportive services to its residents, who must be sixty years of age or older, with periodic charges and an entrance fee. The supportive services provided by the Reserve to its residents include, among other things, maintenance, communal activities, security, transportation, and dining options. All of the supportive services are provided to promote safely aging in place.

---

[1] The plaintiff in *Albaugh* brought the suit for the return of the entrance fee or supplemental fee on behalf of her mother, Shirley Voumard, who was a member of the Reserve and "had to vacate the facility for health reasons." 930 N.W.2d at 679. Albaugh asserted claims of violation of the Iowa Uniform Residential Landlord and Tenant Act (Iowa Code chapter 562A (2016), hereinafter "IURLTA"), consumer fraud, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and unconscionability. *Id.* The supreme court upheld summary judgment in favor of the Reserve.

[2] This is a statutorily defined term and is one of two types of retirement facilities governed by Iowa Code chapter 523D. Iowa Code § 523D.1(3) ("Continuing care retirement community"), .1(10) ("Senior adult congregate living facility"); *see Albaugh*, 930 N.W.2d at 690–91 (Appel, J., dissenting).

Plaintiffs Mary Jane Buck, Lois Erbstein, Lorraine Shirk,[3] and Maureen Wilson (collectively "the Plaintiffs") are current members and residents of the Reserve. Each plaintiff entered into a contract with the Reserve called an "application agreement" (Agreement) to obtain a membership interest in the Reserve and the right to occupy an apartment there. The Agreement contained the following bold-faced language:

> (i) Upon disbursement of such Entrance Fee and such Supplemental Amount to the uses and purposes of the Corporation the Corporation will have no further obligation to refund or return such Entrance Fee or such Supplemental Amount to Applicant.
> (ii) Applicant's ability to recover such Entrance Fee and such Supplemental Amount will depend entirely on the Applicant's ability to assign or transfer his Membership in the Corporation to another person or persons.
> (iii) The Monthly Charge is subject to fluctuation.
> (iv) Upon the transfer of Applicant's Membership in the Corporation to another person or persons there is no guarantee the Applicant will recover the entire Entrance Fee, the entire Supplemental Amount, or such other funds as may have accrued during Applicant's residency within the Development pursuant to Article 7 of the Covenants of Occupancy.
> (v) Should Applicant default under the terms of the Covenants of Occupancy, which default is not cured in a manner deemed satisfactory by the Corporation, Applicant's Residential Membership shall be terminated and all of Applicant's right, title and interest in and to such Entrance Fee, such Supplemental Amount, and such other funds as may have accrued during Applicant's residency within the Development pursuant to Article 7 of the Covenants of Occupancy shall be forfeited by Applicant and become the sole and separate property of the Corporation, and the Corporation shall have the right and authority to transfer Applicant's Apartment to an assignee or transferee. Upon such transfer, the Corporation, in its sole discretion, shall have the right to deduct all Monthly Charges by Applicant and other expenses due and payable upon transfer.

(Emphasis omitted.)

---

[3] Donald Shirk died prior to trial. By consent of the parties, the case proceeded to trial with Lorraine Shirk alone representing the Shirks's interests.

Just above the signature line, the Agreement stated, "This Agreement will supersede any prior understandings and agreements and constitutes the entire agreement between us, and no oral representations or statements shall be considered a part hereof."[4]

Wilson executed the Agreement for Apartment 130 on December 20, 2004. She agreed to pay an entrance fee of $87,983,[5] a supplemental amount of $91,983,[6] and a monthly occupancy fee of $1489.

The Shirks executed the Agreement for Apartment 219 on July 1, 2005. They agreed to pay an entrance fee of $84,998, a supplemental amount of $81,070, and a monthly occupancy fee of $1384.

Buck, who was advised against signing the Agreement, executed the Agreement for Apartment 328 on April 3, 2007. She agreed to pay an entrance fee of $87,929, a supplemental amount of $87,929, and a monthly occupancy fee of $1450.

---

[4] Article 18 of the "Covenants of Occupancy" also provides: "No representations other than those contained in the Agreement, these Covenants of Occupancy, the Articles of Incorporation and the Bylaws of the Corporation shall be binding upon the Corporation or the Resident."

[5] Iowa Code section 523D.1(4) defines an "[e]ntrance fee" as

an initial or deferred transfer to a provider of a sum of money or other property made or promised to be made as full or partial consideration for acceptance of a specified individual in a facility if the amount exceeds either of the following:
(a) Five thousand dollars.
(b) The sum of the regular periodic charges for six months of residency.

[6] The supplemental amount allowed the member to pay less in monthly fees (approximately $600 less) than members who did not agree to pay the supplemental amount. Because all the plaintiffs paid a supplemental amount, their monthly occupancy fees reflect the discount.

Erbstein executed the Agreement for Apartment 238 on November 1, 2009. She agreed to pay an entrance fee of $86,585, a supplemental amount of $86,585, and a monthly occupancy fee of $1555.

The monthly fee paid by all members of the Reserve pays for the month-to-month expenses for operation of the Reserve, such as payroll for the Reserve's employees and expenses associated with the Reserve's social programming and the other services and activities provided to its members. If a member of the Reserve fails to pay their monthly fee, that failure directly affects the other members by requiring the other members to pay increased costs to "cover" for the amounts that have not been paid by another member.

In March 2015, the Reserve's elected board of directors announced a change to the Reserve's financial structure due to the increase in availability of "type A" units the Reserve owned through default or donation and the resulting shortfall in the available monies to pay for its mortgage, its debt service, and the monthly obligation for all of the expenses.[7] The Reserve offered several available type A units to be transferred for an entrance fee of $5000. The Reserve did not change the monthly charges for these units, and the board of directors declared, "Please be assured that there will be no 'steering' of prospects away from member-owned units up for transfer, and we'll continue working hard on moving all available units."

---

[7] Members who selected a type A apartment paid an entrance fee and no supplemental fee. Type A units thus came with a higher monthly charge than "type B" units.

The Reserve subsequently implemented a leasing program in July to allow members to lease their units to qualified individuals and to allow the Reserve to lease the Reserve-owned units "at market-competitive lease rates."

On July 20, 2016, the Plaintiffs filed suit against the Reserve, raising the following claims: count I—violations of the IURLTA (asserting the entrance fee and supplemental amount constituted a rental deposit prohibited by Iowa Code section 562A.6(12)); count II—consumer fraud under Iowa Code chapter 714H (asserting unfair and deceptive practices); count III—violation of Iowa Code chapter 523D (claiming failure to provide a compliant disclosure statement); count IV— declaratory judgment (asserting statutory and common-law unconscionability); and count V—breach of fiduciary duties.[8]

---

[8] The petition alleged:

> The Reserve through its Board of Directors and the company it hired to manage the Reserve, Newbury, breached their fiduciary duties by taking actions detrimental to the Plaintiffs and each Plaintiff's respective investment, Entrance Fee and Supplemental Amount, in the Reserve, by among other things,
>
> (a) Failing to deal with Plaintiffs in an open and honest manner;
>
> (b) Failing to disclose to Plaintiffs how their investment in the Reserve was adversely affected by certain actions of the Board and Newbury, including, but not limited to:
>
> (i) Selling and/or transferring memberships/apartments of former residents at prices below the investments of Plaintiffs;
>
> (ii) By renting forfeited units at rental fees different from the monthly occupancy fees paid by Plaintiffs;
>
> (iii) By selling and/or transferring forfeited units at prices below the investments of the Plaintiffs for similar apartments;
>
> (iv) By advising other similarly situated residents to sell and/or transfer their memberships/investments at prices lower than the investments of the Plaintiffs for similar apartments;
>
> (v) By advising some former residents to forfeit their investments/apartments rather than continuing to pay monthly occupancy fees while no longer occupying their apartments;

On December 19, 2017, the district court granted summary judgment to the Reserve on counts I–III and the statutory-unconscionability-claim portion of count IV. The court concluded it "cannot say as a matter of law that the agreements at issue were not unconscionable at the time they were made." As for count V, the breach-of-fiduciary-duty claim, the court concluded there was an issue of fact as to whether a fiduciary relationship existed between the Plaintiffs and the Reserve such that the Reserve had a duty to protect the value of the Plaintiffs' "investment" (i.e., the entrance fee and supplemental amount).

Trial was held from June 4 to 8, 2018, with the court as fact-finder for the unconscionability claim and the jury as fact-finder for the breach-of-fiduciary-duty claim. The jury found a fiduciary relationship existed, which the Reserve breached with each plaintiff, and awarded damages in the amount of each plaintiff's entrance fee and supplemental amount: Buck—$175,858; Erbstein—$173,170; Shirk—$166,068; and Wilson—$179,966.

On August 6, the court entered an order finding there was a ten-year statute of limitations for the unconscionability claim and Shirk and Wilson's claims were "outside the window of eligibility for relief." The court found Buck's and Erbstein's claims were within the limitations period and found their contracts unconscionable.

---

(vi) By decreasing the amenities offered by the Reserve or failing to add amenities in order to attract buyers willing to invest similar amounts as Plaintiffs; and

(vii) Failing to maintain the Reserve at a level that would attract buyers willing to invest similar amounts as Plaintiffs.

The Reserve filed a motion for judgment notwithstanding the verdict, a motion for new trial, and a motion to amend and enlarge. The district court ruled on the posttrial motions and entered judgment in favor of the Plaintiffs.

The Reserve appeals, and the Plaintiffs cross-appeal.

## II. Scope and Standard of Review.

We review rulings on motions for judgment notwithstanding the verdict for correction of errors at law. *Ferguson v. Exide Techs., Inc.*, 936 N.W.2d 429, 431 (Iowa 2019). We also review a district court ruling on a motion for summary judgment for correction of errors at law. *Albaugh*, 930 N.W.2d at 682. When the moving party has shown "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. *Id.* (citation omitted).

## III. Discussion.

We recognize the district court did not have the benefit of the supreme court's *Albaugh* decision in which it granted summary judgment to the Reserve on substantially identical claims. Under that ruling, we must reverse the judgment entered against the Reserve unless the Plaintiffs are able to distinguish their cases.

### A. The Reserve's Appeal.

**1. Unconscionability.** "Whether an agreement is unconscionable must be determined at the time it was made." *Id.* at 687 (citation omitted). "[W]e examine factors of assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness to determine whether a contract is unconscionable.

Nevertheless, the doctrine of unconscionability does not exist to rescue parties from bad bargains." *Id.* (quotation marks omitted) (citations omitted).

The district court found the Agreement entered into by Buck and Erbstein "contain[s] harsh, oppressive and one-sided terms." The district court wrote:

> The take-away from a careful reading of these documents together[9] is three-fold: (1) Enrollees who have to leave the Reserve because they are no longer capable of living independently must still pay the Reserve their monthly exclusive occupancy fees and expenses until they get their interest in the Reserve sold or assigned; (2) if an enrollee dies after leaving the Reserve, their estate must continue to pay the decedent's monthly exclusive occupancy fees and expenses until the estate gets the decedent's interest in the Reserve sold or assigned; and (3) an enrollee, under the right conditions, could lose their entire investment in the Reserve. For Ms. Buck and Ms. Erbstein, this investment was a six-figure endeavor.
>
> The illustrations stated above confirm that the contested documents contain a number of oppressive and one-sided terms that could challenge the most sophisticated and experienced business person. Ms. Buck and Ms. Erbstein were not business people who had enjoyed decades-long careers routinely forging deals. They were not well-versed in the pluses and minuses of written residency agreements. They wanted a secure place to live, and they trusted that the Reserve would be fair to them in this endeavor. A reasonable person would not agree to abide by the terms and conditions the Reserve imposed upon Ms. Buck and Ms. Erbstein, several of which were substantively unfair. The court finds and concludes that under the record presented, the documents at issue individually and together are substantively unconscionable.

The facts and documents upon which the district court relied in its analysis are not materially different from those in *Albaugh*. *See id.* at 679–80.

Buck and Erbstein contend unconscionability claims are fact-specific and the facts in their cases are distinguishable from those in *Albaugh*. The district court

---

[9] The district court considered three sets of documents it described as "(1) a seventeen-page disclosure statement; (2) a seven-page application agreement with attached schedules I and II which they were required to ratify; and (3) an eighteen-page document entitled 'covenants of occupancy.'"

noted the "oppressive and one-sided" contract terms; Buck's and Erbstein's six-figure investments; and that Buck and Erbstein "were not business people," "wanted a secure place to live," and "trusted that the Reserve would be fair to them in this endeavor."

Buck's and Erbstein's circumstances are not materially different from those of the member in *Albaugh,* Shirley Voumard—her entrance fee and supplemental fee constituted a six-figure endeavor, *id.* at 679; she signed the same Agreement, *id.* at 680*;* and despite the clear language of the Agreement, Albaugh claimed "Voumard entered into the agreement with the understanding that the Reserve would refund her entrance fee and supplemental amount and no one informed Voumard that the Reserve would begin leasing or selling units in this manner," *id.* at 685. While the district court mentioned that Buck and Erbstein were "not well-versed in the pluses and minuses of written residency agreements," the evidence presented was that each applicant had the opportunity to seek the advice of others. The only discernable difference in circumstances is that Voumard was no longer a resident due to her inability to care for herself.

The Agreement terms here are the same that Albaugh alleged were unconscionable, and the supreme court found:

> The agreement did not contain any elements of unfair surprise, as it clearly informed Voumard of her payment obligations regardless of whether she was still occupying her unit. It provided her with explicit notice that her ability to recover the entrance fee and supplemental amount depended entirely on her ability to assign or transfer her membership interest to someone else, and Voumard assented to the terms of the agreement. Nothing in the record suggests Voumard was unable to understand what she was assenting to.

*Albaugh* 930 N.W.2d at 687. The supreme court concluded the Agreement was not unconscionable. *Id.* at 688.

Buck and Erbstein presented no evidence they were unable to understand the terms of the Agreement. The Agreement all plaintiffs entered into did not contain any elements of unfair surprise, as it clearly informed each plaintiff of their payment obligations regardless of whether they were still occupying their unit. *See id.* at 687. The Agreement provided each plaintiff with explicit notice that their ability to recover the entrance fee and supplemental amount depended entirely on their ability to assign or transfer their membership interest to someone else, and each plaintiff assented to the terms of the agreement. *See id.* Nothing in the record suggests any plaintiff was unable to understand what they were assenting to.

Each plaintiff and the Reserve entered into the Agreement on equal footing, so there was not a disparity of bargaining power. *See id.* at 687–88. We find unconvincing the Plaintiffs' claim that the Agreement is so "harsh, oppressive, and one-sided" that "no man in his senses and not under delusion would make" it. In particular, we consider that Buck entered into the Agreement contrary to her daughter's advice, and others were part of a group of friends who all chose the Reserve as their retirement community. *Cf. id.* at 688.

Finally, we note the supreme court held "Iowa Code chapter 523D expressly allows the entrance fee and supplemental amount outlined in the Reserve's agreement." *Id.*; *see* Iowa Code §§ 523D.2, .3, .6. Considering these factors, we reverse the district court's judgment in favor of Buck and Erbstein on their claim of unconscionability.

***2. Breach of Fiduciary Duty.*** The Reserve contends the district court erred in denying its motions for summary judgment, directed verdict, and judgment notwithstanding the verdict on grounds the Plaintiffs could not identify a fiduciary duty owed to each of them. We agree.

Buck, Erbstein, Shirk, and Wilson each entered into the Agreement with the Reserve as unrelated and unaffiliated parties. Each negotiated and entered the Agreement on equal footing without the Reserve having any form of influence over them. And the Agreement each signed clearly stated there was "no guarantee [the member] will recover the entire Entrance Fee, the entire Supplemental Amount, or such other funds as may have accrued during [her] residency within the Development." *See Albaugh*, 930 N.W.2d at 685–86.

As we already noted, the district court did not have the benefit of the *Albaugh* opinion when it ruled on the Reserve's motion for summary judgment and posttrial motions and found substantial evidence supports the existence of a fiduciary duty between Plaintiffs and the Reserve. But, the *Albaugh* court affirmed the grant of summary judgment in favor of the Reserve on substantially the same asserted claim. *Id.* at 686. In fact, the *Albaugh* court found "nothing in the record supports Albaugh's claim that a fiduciary relationship existed between the parties." *Id.* The court further explained, "The Reserve was managed by a board of directors, a majority of whom were elected by all members, including Voumard. The directors owed a fiduciary duty to act for the benefit of the Reserve, not an individual member."[10] *Id.* at 686 n.3.

---

[10] We observe that while there was a dissent in *Albaugh*, that dissent was aimed only at the applicability of the IURLTA. 930 N.W.2d at 699 (Appel, J., dissenting)

Like the Plaintiffs in this case, Albaugh argued the Reserve owed a fiduciary duty to Voumard because the she "relied on the Reserve to protect the value of her membership." *Id.* at 685. The *Albaugh* court rejected this argument:

> A fiduciary relationship "exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other." Indicative factors of a fiduciary relationship
>
> > include the acting of one person for another; the having and the exercising of influence over one person by another; the reposing of confidence by one person in another; the dominance of one person by another; the inequality of the parties; and the dependence of one person upon another.
>
> In contrast, a fiduciary relationship does not exist when the relationship exists through an "arms-length transaction," which is "[a] transaction between two unrelated and unaffiliated parties" or "[a] transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises."
>
> > The district court correctly granted the Reserve's motion for summary judgment on this issue because Voumard and the Reserve engaged in an arms-length transaction that did not establish a fiduciary relationship. The record demonstrates that Voumard and the Reserve entered into the agreement as unrelated and unaffiliated parties. The indicative factors of a fiduciary relationship are not present here, as Voumard and the Reserve negotiated and entered the agreement on equal footing without the Reserve having any form of influence over Voumard. Moreover, despite Albaugh's claim that Voumard put her confidence in the Reserve to protect her entrance fee and supplemental amount, we have already noted the application agreement between Voumard and the Reserve stated there was "no guarantee [Voumard] will recover the entire Entrance Fee, the entire Supplemental Amount, or such other funds as may have accrued during [her] residency within the Development." Overall, nothing in the record supports Albaugh's claim that a fiduciary relationship existed between the parties.

*Id.* at 685–86 (internal citations omitted).

---

("I would reverse the district court judgment on the IURLTA claim, grant summary judgment to Albaugh on the IURLTA claim, and remand to the district court for further proceedings.").

The Plaintiffs have provided no persuasive factors to distinguish their positions from Voumard's. As a matter of law, the Reserve had no fiduciary relationship with the Plaintiffs. *See id.* We reverse the judgment entered on this ground.

**B. Plaintiffs' Cross-appeal.** The Plaintiffs assert the district court erred in granting partial summary judgment in favor of the Reserve based on its conclusions that the IURLTA does not apply to the Reserve and the Plaintiffs' consumer fraud claims were untimely and barred.

### 1. IURLTA.

The Plaintiffs claim the Reserve's Agreement and corresponding entrance fee, which is expressly permitted by specific provisions of chapter 523D, should nonetheless be prohibited by the IURLTA and the Reserve's use of same has violated chapter 562A. This contention has already been rejected by our supreme court. *Id.* at 682–84.[11] The *Albaugh* court expressly concluded "the legislature did

---

[11] The *Albaugh* court reasoned,

Iowa Code chapter 523D is entitled "Retirement Facilities" and is applicable to a provider who executes a contract for housing and one or more "supportive services" in a facility that "is or will be located in this state" and where the contract "requires or permits the payment of an entrance fee." Iowa Code §§ 523D.1, .2. Some examples of supportive services include activity services, housekeeping, dining options, emergency nursing care, and transportation. *Id.* § 523D.1(12). As a provider that contracts with residents to supply this sort of housing and living services in an Iowa facility, the Reserve is considered a retirement facility and thus governed by chapter 523D.

On the other hand, "[t]he IURLTA generally defines the legal rights and obligations of a landlord and tenant" in a rental agreement. *Lewis v. Jaeger*, 818 N.W.2d 165, 178 (Iowa 2012). A "'rental agreement' means an agreement . . . embodying the terms and conditions concerning the use and occupancy of a dwelling unit and premises." Iowa Code § 562A.6(11).

not intend the fees permitted by chapter 523D be subject to the rental deposit provision of the IURLTA." *Id.* at 684. We are not at liberty to overturn this precedent. *See State v. Eichler*, 83 N.W.2d 576, 578 (Iowa 1957) ("If our previous holdings are to be overruled, we should ordinarily prefer to do it ourselves."); *State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990).

**2. Consumer Fraud.** The Plaintiffs argue the Reserve engaged in unfair practices in 2015 when it began to lease units without requiring an entrance fee. They assert the statute of limitations does not bar the claim because Iowa

---

The crux of Albaugh's claim against the Reserve concerning the IURLTA is that Voumard's $64,975 entrance fee and $63,557 supplemental amount should be refunded to Voumard because they are improper rental deposits under the IURLTA. *This brings us to the fundamental issue: whether the fees permitted by chapter 523D are rental deposits subject to the IURLTA.*

. . . .

Affording each statute its proper context, the words used by the legislature reflect the intent to regulate two entirely distinct living arrangements. Chapter 523D regulates facilities that provide housing together with supportive services. In contrast, chapter 562A pertains to the rights and obligations of a landlord and tenant. This distinction is made plain by what the legislature said in each definition. An entrance fee only qualifies as an entrance fee if the amount exceeds "five thousand dollars" or "[t]he sum of the regular periodic charges for six months of residency" and is used as consideration for acceptance in a facility. *Id.* § 523D.1(4)(a)–(b). A rental deposit, however, is limited to "two months' rent" and may only be used to remedy the tenant's default, to restore the dwelling unit to its prior condition, and to recover expenses associated with the recovery of the premises. *Id.* § 562A.12(1), (3)(a). This reasonably demonstrates the legislature did not contemplate the use of an entrance fee as a rental deposit because the statutory definition of entrance fee is neither constrained to two months' rent nor restricted as a landlord's remedial function.

We conclude the plain statutory language makes clear the legislature did not intend the fees permitted by chapter 523D be subject to the rental deposit provision of the IURLTA.

*Albaugh*, 930 N.W.2d at 682–84.

Code section 714H.3(1) is not limited to practices occurring at the time the Plaintiffs' entered into the Agreement "but applies more broadly to post-sale conduct which is 'related to, linked to, or associated with' the sale." *See State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 525–28 (Iowa 2005) (examining unfair practices under Iowa's consumer fraud act).

The district court rejected the Plaintiffs' contention that their claims were not barred because they were brought within two years of the discovery of the violation of the chapter. Even aside from the statute of limitations problem, we find the Plaintiffs have failed to allege a cause of action.

Section 714H.3(1) describes prohibited conduct under the act, providing in part:

> A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes. For the purposes of this chapter, a claimant alleging an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation must prove that the prohibited practice related to a material fact or facts.

The district court observed the Plaintiffs did not assert "the representations allegedly made by the Reserve were known or should have been known to be unfair or untrue at the time they were made, or when the units were advertised, or when the transfer of the memberships at the Reserve were made to plaintiffs." We agree. The Plaintiffs' allegations do not fall within section 714H.3(1), and thus their claim fails. *See Albaugh*, 930 N.W.2d at 685 ("Albaugh's argument that a

reasonable jury could find the Reserve's actions unfair and 'rely on its own common sense' to support this conclusion does not demonstrate that the Reserve knew or should have known it was engaging in an unfair practice. There is no evidence that the Reserve knew in 2007—when Voumard entered her agreement with the Reserve—that it would have to lower the price on entrance fees in 2015."). The court did not err in granting summary judgment to the Reserve on this count.

**IV. Summary.**

On the Reserve's appeal, we reverse the adverse judgments entered on the Plaintiffs' claims of breach of fiduciary duty and unconscionable contract and remand for dismissal. On the Plaintiffs' cross-appeal, we affirm the entry of summary judgment on the IURLTA claim and the claim of consumer fraud.

**REVERSED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**