MANSFIELD, Justice.
A dishonest employee of a trucking company put money in his pocket while claiming to be buying fuel for his fellow employees. This fraud was perpetrated at a truck stop, where the employee used his company credit card to obtain cash while reporting purchases of fuel. The truck stop paid out the cash, accepting the employee’s bogus explanation that the money was for other employees’ fuel purchases, and was reimbursed pursuant to its contract with the card issuer. The card issuer in turn was reimbursed under a separate contract with the trucking company’s parent. After the fraud had been ongoing for several years, it was discovered, and the employee was arrested and convicted of theft.
The trucking company’s parent now seeks to reverse the contractual flow of dollars by suing the truck stop both for negligence and as an alleged third-party beneficiary of the contract between the card issuer and the truck stop. We agree with the district court that the economic loss rule bars the negligence claim and that the trucking company’s parent was not a third-party beneficiary of the contract between the card issuer and the truck stop. Accordingly, we affirm the summary judgment granted to the truck stop below.
I. Background Facts and Proceedings.
Annett Holdings, Inc. is an Iowa holding company. One of its subsidiaries is TMC *501 Transportation, a trucking company that employed Michael Vititoe as a shag driver at the Clow Valve plant in Oskaloosa. Vi-titoe’s duties as a shag driver consisted of moving empty and loaded semi-tractor trailers within the yard of the Clow Valve plant, facilitating the loading and unloading of trailers, and facilitating the transportation of Clow Valve products by other TMC drivers to outside destinations. TMC provided Vititoe a truck along with a Comdata credit card to purchase fuel for the truck.
Annett and Comdata had a written agreement. Under the agreement, Corn-data provided cards that could be used by authorized Annett employees to purchase fuel and obtain cash advances at any Corn-data authorized service center locations. Annett agreed to accept full responsibility for all purchases made with those cards and also to be “fully responsible for the unauthorized or fraudulent use thereof until such time as Comdata has received such notification from [Annett] provided that each fraud or misuse is not attributed to Comdata.” Annett also agreed to “hold Comdata harmless from any and all liability resulting from the acts of any employees or agents of [Annett] which acts shall include but are not limited to negligent acts of such persons.” A separate schedule, signed by both parties, clarified that the Annett/Comdata agreement extended to Annett’s TMC subsidiary.
Comdata in turn had a written contract with Kum & Go, L.C. that enabled a particular Kum & Go store in Oskaloosa to handle Comdata transactions. The agreement provided that this Kum & Go service center would lease a Comdata terminal for $80 per month, which would then be utilized for Comdata card transactions. Comdata would reimburse Kum & Go for those transactions after deducting certain fees. The agreement contained detailed procedures that Kum & Go promised to follow in processing Comdata transactions. The Comdata/Kum & Go agreement was governed by Tennessee law.
From November 2002 to April 2006, while Vititoe was employed by TMC, he went to the Kum & Go in Oskaloosa on an almost daily basis. Store personnel allowed Vititoe to operate the Comdata terminal himself. Vititoe managed to steal money by entering fuel purchases on the Comdata machine and submitting cash advance slips printed out by the machine to the store clerks — who then paid Vititoe in cash. Kum & Go personnel wondered why Vititoe was getting cash back while reporting fuel purchases. He claimed he was doing so because he was a “regional supervisor” and needed cash to pay for other employees’ fuel purchases because the other employees did not have cards of their own.
Vititoe’s Comdata transactions were reported, reviewed, and validated daily by TMC’s fuel manager. For reasons that are not clear, the pre-March 2006 fuel manager never noticed (or at least never did anything about) Vititoe’s suspicious activity. In March 2006, a new fuel manager took over. Almost immediately, he noticed Vititoe’s pattern of “buying” fuel every day, even on weekends when he was supposedly not working and despite the fact Vititoe was only a local shag driver.
On April 10, 2006, a TMC employee followed Vititoe and observed him using the Comdata card, but not putting any gas in his truck. The police were contacted, and they interviewed Vititoe, who admitted he had stolen money from his employer by misusing the gas card. Vititoe was arrested and charged with first-degree theft. He was subsequently convicted of theft, sentenced to one month incarceration, and ordered to pay restitution of $298,524.79.
*502 Annett filed a petition against Kum & Go alleging, among other theories, negligence and breach of contract for the monetary losses it suffered through Vititoe’s theft. Annett’s negligence theory asserted that Kum & Go was negligent in providing cash to Vititoe and that Vititoe did not have actual or apparent authority to receive cash back on Comdata transactions. In its breach of contract claim, Annett alleged it was an intended third-party beneficiary of the contract between Kum & Go and Comdata, and Kum & Go had breached the terms of the contract by failing to comply with its procedures.
Kum & Go moved for summary judgment. Kum & Go argued it could not be liable in negligence due to the “economic loss rule” and because it owed no duty to Annett. Kum & Go also denied Annett was a third-party beneficiary of its contract with Comdata.
The district court granted summary judgment to Kum & Go. It found the negligence claim barred by the economic loss rule. It rejected the breach of contract claim on the ground that Annett was not an intended beneficiary of the Comda-ta/Kum & Go contract. Annett appeals.
II. Standard of Review.
The district court disposed of the case on summary judgment. We review rulings on summary judgment motions for errors at law. Ranes v. Adams Labs., Inc., 778 N.W.2d 677, 685 (Iowa 2010). “We examine the record to determine whether a material fact is in dispute and, if not, whether the district court properly applied the law.” Id.
III. Analysis.
A. Economic Loss Rule. In this case, Annett seeks to recover an economic loss. No one was injured; no property was damaged or destroyed. Rather, Vititoe made unauthorized withdrawals of cash that were charged to Comdata and ultimately to Annett. Annett now claims that Kum & Go was negligent in failing to prevent this unauthorized activity, which resulted, indirectly, in economic losses to Annett.
Notably, Annett had entered into a contract with the card provider, Comdata, which in turn had entered into a contract with Kum & Go. In the contract with Comdata, Annett assumed responsibility for unauthorized or fraudulent use of Corn-data cards by its own employees. Annett does not dispute that this contract bars it from recovering against Comdata, but seeks now to recover in tort from the remote party with which Comdata contracted — Kum & Go.
We are unaware of a parallel to this claim in our reported case law, but other appellate courts have recently addressed and rejected similar claims. In Cumis Insurance Society, Inc. v. BJ’s Wholesale Club, Inc., 455 Mass. 458, 918 N.E.2d 36 (2009), the Massachusetts Supreme Judicial Court considered claims brought by credit unions and their insurer against a retailer (BJ’s) that had improperly stored credit card data in a manner that allowed thieves to access the data, resulting in fraudulent use of the credit cards. The credit unions and their insurer had to absorb the losses from the fraudulent use, so they sued BJ’s, alleging that its negligence and its failure to follow the express terms of its own agreement with its merchant bank had enabled this criminal activity. Cumis, 918 N.E.2d at 39-40. The court found the economic loss rule barred the negligence claims, rejecting the plaintiffs’ attempt to overcome that rule by arguing that tangible personal property damage (in addition to economic loss) was involved because the compromised credit cards had to be replaced and reissued. Id. at 46-47; *503 accord Sovereign Bank v. BJ’s Wholesale Chib, Inc., 538 F.3d 162, 176-77, 179-80 (3d Cir.2008) (reaching the same result in a case filed against BJ’s under Pennsylvania law); see also Azur v. Chase Bank, USA, Nat’l Ass’n, 601 F.3d 212, 213-14 (3d Cir.2010) (holding that Pennsylvania law barred a credit card account holder from suing a bank for negligently allowing the holder’s personal assistant to misappropriate over $1 million through fraudulent transactions); In re TJX Cos. Retail Sec. Breach Litig., 564 F.3d 489, 498-99 (1st Cir.2009) (applying Massachusetts law); Huggins v. Citibank, N.A., 355 S.C. 329, 585 S.E.2d 275, 276-77 (2003) (holding an individual could not bring a negligence claim against credit card issuer for negligently issuing a card to a person who had stolen the individual’s identity).[1]
As a general proposition, the economic loss rule bars recovery in negligence when the plaintiff has suffered only economic loss. Neb. Innkeepers, Inc. v. Pittsburgh-Des Moines Corp., 345 N.W.2d 124, 126 (Iowa 1984). In Nebraska Innkeepers, we acknowledged “[t]he well-established general rule is that a plaintiff who has suffered only economic loss due to another’s negligence has not been injured in a manner which is legally cognizable or com-pensable.” Id. (citing Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 309, 48 S.Ct. 134, 135, 72 L.Ed. 290, 292 (1927)).
Robins, an admiralty decision authored by Justice Holmes, is perhaps the first noteworthy decision on the economic loss rule, but it is not the starting-point of the doctrine. See Restatement (Second) of Torts § 766C, reporter’s note and cross references through December 1977 (1981), available at http://www.westlaw.com (citing various pre-Robins cases). As one commentator has said:
For well over a century, it has been a settled feature of American and English tort law that in a variety of situations there is no recovery in negligence for pure economic loss, that is, for economic loss unrelated to injury to the person or the property of the plaintiff.
Peter Benson, The Problem with Pure Economic Loss, 60 S.C. L.Rev. 823, 823 (2009).
This rule is partly intended to prevent the “Death of Contract,” see Grant Gilmore, The Death of Contract (2d ed.1995), or the tortification of contract law. When two parties have a contractual relationship, the economic loss rule prevents one party from bringing a negligence action against the other over the first party’s defeated expectations — a subject matter the parties can be presumed to have allocated between themselves in their contract. See Determan v. Johnson, 613 N.W.2d 259, 262-63 (Iowa 2000) (claim by home buyer against home sellers); Nelson v. Todd’s Ltd., 426 N.W.2d 120, 125 (Iowa 1988) (claim by butcher against manufacturer of a defective meat curing agent); see also Audio Odyssey, Ltd. v. United States, 373 F.3d 870, 872-73 (8th Cir.2004) (applying Iowa law) (claim by borrower against loan guarantor). This is sometimes referred to as “the contractual economic loss rule.” See Dan B. Dobbs, An Intro *504 duction to Non-Statutory Economic Loss Claims, 48 Ariz. L.Rev. 713, 723 (2006) [hereinafter Dobbs]. Courts reason that when a party enters into a contract, that document should control the party’s rights and duties. Id.
But the doctrine is by no means limited to the situation where the plaintiff and the defendant are in direct contractual privity. For example, in Nebraska Innkeepers, plaintiffs sought recovery from a bridge contractor for purely economic loss that occurred when the bridge had to be closed because of the contractor’s negligence. 345 N.W.2d at 128-29. This is an example of what is sometimes called “the stranger economic loss rule.” See Dobbs, 48 Ariz. L.Rev. at 715. This aspect of the economic loss rule has several underlying justifications. In a complex society such as ours, economic reverberations travel quickly and widely, resulting in potentially limitless liability. As Professor Dobbs puts it, “Stand-alone economic loss often spreads without limit.” Id. Also, the rule encourages parties to enter into contracts. Id. at 716-17.
Another case where this court applied “the stranger economic loss” rule, although without so describing it, is Anderson Plasterers v. Meinecke, 543 N.W.2d 612, 613 (Iowa 1996). There, two workers were injured by a negligent third party. The employer sued the third party for its economic losses, e.g., loss of the workers’ time and the expense of hiring replacement workers. We refused to recognize the claim. Id. at 613-14. Likewise, in State ex rel. Miller v. Philip Morris Inc., 577 N.W.2d 401, 406-07 (Iowa 1998), we held the State could not recover certain economic losses (i.e., Medicaid expenses) it had incurred because of smoking-related illnesses allegedly caused by the defendant tobacco companies.
The economic loss rule is subject to qualifications. For example, purely economic losses are recoverable in actions asserting claims of professional negligence against attorneys and accountants. Van Sickle Constr. Co. v. Wachovia Commercial Mortg., 783 N.W.2d 684, 692 n. 5 (Iowa 2010). Also, negligent misrepresentation claims fall outside the scope of the economic loss rule. Id. at 694. In addition, when the duty of care arises out of a principal-agent relationship, economic losses may be recoverable. Langwith v. Am. Nat’l Gen. Ins. Co., 793 N.W.2d 215, 222 (Iowa 2010).
We need not attempt to delineate the precise contours of the economic loss rule in Iowa. For present purposes, it is enough for us to note that Annett’s cause of action bears a number of characteristics that bring it within the scope of the economic loss rule. The claim does not fall under any of the recognized exceptions or qualifications to the economic loss rule. See id.; Van Sickle Constr. Co., 783 N.W.2d at 692 n. 5. It is a remote economic loss claim, similar in that respect to the claims we rejected in Nebraska Innkeepers, Anderson Plasterers, and Philip Morris, but with the additional twist that this case does not even involve an initial personal injury or damage to property.
Also, although Annett did not have a direct contractual relationship with Kum & Go, it had a contract with Comdata which in turn had contracted with Kum & Go. When parties enter into a chain of contracts, even if the two parties at issue have not actually entered into an agreement with each other, courts have applied the “contractual economic loss rule” to bar tort claims for economic loss, on the theory that tort law should not supplant a consensual network of contracts. See Dobbs, 48 Ariz. L.Rev. at 726; Mark P. Gergen, The Ambit of Negligence Liability for Pure *505 Economic Loss, 48 Ariz. L.Rev. 749, 764-65 (2006) [hereinafter Gergen] (noting that liability has been precluded when the claimant could have obtained redress for the harm from the actor by contract with the actor “or through a chain of contracts reaching back to the actor”).[2]
An illustration of this principle is Richards v. Midland Brick Sales Co., Inc., 551 N.W.2d 649, 650-52 (Iowa Ct.App.1996), in which the court of appeals found that the economic loss rule barred a tort claim by a homeowner against a brick supplier. The homeowner there had contracted with a builder, which in turn had contracted with the brick supplier. Richards, 551 N.W.2d at 650. Similarly, in Tomka v. Hoechst Celanese Corp., 528 N.W.2d 103, 106-07 (Iowa 1995), we rejected economic loss claims by a cattle feeder against a manufacturer of synthetic growth hormones, even though the feeder had no contract with the manufacturer, having purchased the hormones through local veterinarians.
Here Annett agreed with Comdata that it would be “fully responsible” for the fraudulent or unauthorized use of credit cards. Annett knew that Comdata would be entering into agreements with service centers, that Comdata would be reimbursing service centers for charges made to the credit cards, and that Comdata would in turn expect reimbursement from Annett. Also, Annett had the capacity to prevent fraudulent or unauthorized use by its employee: Its subsidiary TMC received a daily report of Vititoe’s transactions, and as soon as a new fuel manager took over, that person noticed the suspicious activity immediately. It is difficult to see why a tort remedy is needed here. Annett contracted to assume certain risks of financial loss and had the ability to minimize those risks.
Even a recent critic of some applications of the economic loss rule concedes the doctrine can be applied when the plaintiff is in a contractual chain of distribution leading to the defendant. See Vincent R. Johnson, The Boundary-Line Function of the Economic Loss Rule, 66 Wash. & Lee L.Rev. 523, 556-57 (2009) (“A purchaser seeking purely economic losses should not be permitted to complain, under tort principles, against anyone in the chain of distribution that the product bought was not better ... than what the plaintiff bargained for under the law of contract.... With respect, to purely economic loss, it is ordinarily fair to bind the plaintiff by the terms of the agreement to which the plaintiff assented.”) The chain of contracts here involved services rather than a product, but that does not compel a different result. Robins itself concerned two linked service agreements. In Robins, a group of individuals had chartered a ship from its owner which in turn contracted with a dry dock for repair of the ship. When negligent repairs at some point resulted in damage to the ship and losses to the charterers, they sued the dry dock. Robins, 275 U.S. at 307, 48 S.Ct. at 134, 72 L.Ed. at 292. The U.S. Supreme Court denied relief. Id. at 308-10, 48 S.Ct. at 135-36, 72 L.Ed. at 292-93. As Justice Holmes explained, “The law does not spread its protection so far.” Id. at 309, 48 S.Ct. at 135, 72 L.Ed. at 292.
*506 We cited Robins with approval in Nebraska Innkeepers. 345 N.W.2d at 126. As noted above, we summarized the rule in broad terms. Id. We did not confine the economic loss rule to situations where the defendant was supplying a product. See also Audio Odyssey, 373 F.3d at 872-73 (applying Iowa’s economic loss rule to a service relationship).
Additionally, in Determan and Nelson, we announced a series of factors to be considered in applying the economic loss rule. We focused on “ ‘the nature of the defect, the type of risk, and the manner in which the injury arose’ ” as well as “the type of damages that the plaintiff seeks to recover.” Determan, 613 N.W.2d at 263 (quoting Nelson, 426 N.W.2d at 124). Those cases involved product defect claims in which there had been some physical consequences — i.e., a sagging roof in De-terman and spoiled meat in Nelson. It is not clear to us that the Determan/Nelson factors are relevant when the claim is for negligence resulting only in financial harm. But in any event, those factors favor the application of the economic loss rule here. There was no risk of physical harm; there was no “defect”; and the “injury” (loss of money) occurred gradually and over a long period of time.
Annett tries to analogize this case to Waukon Auto Supply v. Farmers & Merchants Savings Bank, 440 N.W.2d 844 (Iowa 1989) and Phariss v. Eddy, 478 N.W.2d 848 (Iowa Ct.App.1991), but we find the comparison unpersuasive. In those cases, banks that cashed checks and handed out funds based on forged or unauthorized endorsements were found liable to the actual payees of those checks. However, the liability in those cases was based on conversion under Article 3 of the Uniform Commercial Code, not negligence. Waukon Auto Supply, 440 N.W.2d at 849; Phariss, 478 N.W.2d at 851. If anything, those decisions provide another justification for the application of the economic loss rule here. If parties could simply bring negligence claims whenever financial transactions went awry, there would be little need for the elaborate payment system rules set forth in Articles 3 and 4 of the U.C.C.
Lastly, as we noted earlier, this claim resembles tort claims that have been rejected recently by state and federal appellate courts in Massachusetts and Pennsylvania. No persuasive reason has been offered for us to depart from those decisions here in Iowa. Accordingly, we affirm the grant of summary judgment to Kum & Go on Annett’s negligence claim, and now turn to its third-party beneficiary claim.[3]
B. Third-Party Beneficiary Claim. In the alternative, Annett claims it was a *507 third-party beneficiary of the contract between Comdata and Kum <& Go. That contract had a Tennessee choice-of-law provision. Both parties therefore agree that Annett’s claim to third-party beneficiary status is governed by Tennessee law.
Under Tennessee law, “contracts are presumed to be ‘executed for the benefit of the parties thereto and not third persons.’ ” Owner-Operator Indep. Drivers Ass’n, Inc. v. Concord EFS, Inc., 59 S.W.3d 63, 68 (Tenn.2001) (quoting Oman Constr. Co. v. Tenn. Cent. Ry., 212 Tenn. 556, 370 S.W.2d 563, 572 (1963)). Tennessee follows the general rule that a third party must be an “intended beneficiary” of a contract to have the right to enforce it. Id. There must be “ ‘the clear intent to have the contract operate for the benefit of a third party.’ ” Id. at 68-69 (quoting First Tenn. Bank Nat’l Ass’n v. Thoroughbred Motor Cars, Inc., 932 S.W.2d 928, 930 (Tenn.Ct.App.1996)).[4]
In the Owner-Operator case, the Tennessee Supreme Court held that individual credit card holders were not third-party beneficiaries with the right to enforce contracts between the card issuers and merchants prohibiting surcharges on credit card transactions. Id. at 65. We believe the reasoning of that decision controls here. Here, as in the Owner-Operator case, the agreement did not expressly provide that there would be no third-party beneficiaries, but there was an anti-assignment provision, which in the Tennessee court’s view tended to weigh against a finding of third-party beneficiary status. Id. at 71. Also, while the contract between Comdata and Kum & Go imposed detailed processing requirements on Kum & Go, it did not indicate those requirements were to benefit Annett; rather, they appear from the contract simply intended to protect Comdata. Id. at 73 (noting terms of contract made clear card issuer’s intent was to maximize its own profits, not to confer benefits on third-party beneficiaries).
As the district court pointed out, the intent to benefit Comdata rather than third parties is made manifest by the structure and wording of the agreement. Subsections 4(a) and 4(b) set forth the processing requirements. Subsection 4(c) then provides that Comdata shall have the “right to refuse” or (having accepted) to reverse any transaction where those requirements were not followed. This stands as an explicit statement that the intended beneficiary of subsections 4(a) and 4(b) is Comdata and not anyone else. As the district court explained:
Such language evinces Comdata’s intent to reserve the right to enforce the transaction procedures itself, and as a necessary corollary, the right to determine when a service center has failed to appropriately follow the transaction procedures. To allow a third party to make its own determination as to when a service center has failed to abide by the procedures, and to further attempt to enforce said procedures in a court of law, would be contrary to the intent of the parties under the contract.
We agree with the district court’s views on this matter.
IV. Conclusion.
For the reasons stated herein, we affirm the district court’s order granting summary judgment to Kum & Go.
AFFIRMED.
*508 All justices concur except WIGGINS and HECHT, JJ., who dissent, and APPEL, J., who takes no part.

. In In re Hannaford Bros. Co. Customer Data Security Breach Litigation, 613 F.Supp.2d 108, 126-28 (D.Me.2009), a federal district court sitting in Maine ruled that grocery store customers could sue a grocery store owner for alleged negligence in handling their electronic payment data. Hannaford rests on a view that the economic loss doctrine in Maine is limited to situations where an alleged defect in a product causes damage to the product itself. Id. at 127-28. We believe Hannaford is inconsistent with Iowa law, since Hannaford recognizes general negligence recovery for pure economic loss even when parties are in contractual privity.

. Professor Gergen, building on the work of another scholar (Professor Jane Stapleton), describes two general criteria to determine when an actor is not subject to negligence liability for pure economic loss: (1) negligence liability would expose an actor to a risk of indeterminate liability; and (2) other mechanisms (e.g., contract law) exist to regulate the actor's unreasonable conduct or to prevent or redress the harm. Gergen, 48 Ariz. L.Rev. at 763-65. In a big picture sense, these two categories resemble Professor Dobbs's two categories of "stranger economic loss” and "contractual economic loss.”

. In our view, it does not advance the analysis to assert that Kum & Go owed an "independent duty" to Annett to use ordinary care. This rephrases the question, but does not answer it. We have said "the existence of a duty is a policy decision, based on the relevant circumstances, that the law should protect a particular person from a particular type of harm.” Van Essen v. McCormick Enters. Co., 599 N.W.2d 716, 719 (Iowa 1999). The economic loss rule says, in effect, under some circumstances, a party does not owe a duty to another party to protect it from pure economic losses. Whether the issue is framed in terms of the economic loss rule or the scope of an actor’s duly, we still need to malte the underlying determination whether tort law affords a potential remedy.
At a minimum, before one can claim the existence of an "independent duty” running from Kum & Go to Annett, it is necessary to identify the source of that duty. The federal district court decision in Hannaford does not help in that regard. The court there found a duty based on an implied contract between the grocery store customer and the grocery store. 613 F.Supp.2d at 118-19. There was no contract between Kum & Go and Annett.

. Tennessee, like Iowa, follows the third-party beneficiary principles set forth in the Restatement (Second) of Contracts. See Restatement (Second) of Contracts § 302, at 439-40 (1981); see also RPC Liquidation v. Iowa Dep’t of Transp., 717 N.W.2d 317, 319-20 (Iowa 2006); Owner-Operator Indep. Drivers Ass’n, 59 S.W.3d at 69-70.