# IN THE COURT OF APPEALS OF IOWA

No. 23-0565
Filed August 21, 2024

**SCHEER AGRI-ENTERPRISES, INC.,**
    Plaintiff-Appellant,

**vs.**

**NORSVIN USA, LLC d/b/a TOPIGS NORSVIN USA and LEDGER SWINE FARMS, INC.,**
    Defendants-Appellees.

_____

Appeal from the Iowa District Court for Iowa County, David M. Cox, Judge.

Scheer Agri-Enterprises, Inc., appeals the district court's orders granting summary judgment in favor of defendants. **AFFIRMED.**

Brant D. Kahler of Brown, Winick, Graves, Gross & Baskerville, P.L.C., Des Moines, for appellant.

William H. Roemerman of Read & Roemerman, PLC, Cedar Rapids, for appellee Ledger Swine Farms, Inc.

Rick J. Halbur and Matthew C. Berger of Gislason & Hunter LLP, New Ulm, Minnesota, for appellee Norsvin USA, LLC d/b/a Topigs Norsvin USA.

Heard by Bower, C.J., and Tabor and Greer, JJ., but decided by Tabor, P.J., Greer, J., and Bower, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**BOWER, Senior Judge.**

Scheer Agri-Enterprises, Inc. (Scheer) appeals the district court's orders granting summary judgment in favor of Ledger Swine Farms, Inc., and Norsvin USA, LLC, d/b/a Topigs Norsvin USA and dismissing Scheer's claims of negligence, breach of contract, breach of implied warranty, and vicarious liability. Upon review, we affirm.

## I.    *Background Facts and Proceedings*

Scheer is a farming company in the business of raising pigs for commercial sale. In 2017, Scheer approached Norsvin USA, LLC, d/b/a Topigs Norsvin USA (Topigs) about purchasing approximately 1000 gilts to use as breeding stock.[1] Topigs outsourced Scheer's request to Ledger Swine Farms, Inc., (Ledger), which sold swine containing Topigs' genetic material under a licensing agreement with Topigs. Scheer agreed to purchase several loads of gilts from Ledger, pursuant to the terms of a "Genetic Supply Agreement" (GSA). Scheer and Ledger also discussed testing the gilts for porcine pathogens and diseases, including Porcine Reproductive & Respiratory Syndrome (PRRS). Ledger agreed to conduct saliva tests on the gilts prior to each load "unless the shipment occurred following a scheduled monthly veterinarian visit," and "[f]or the shipments following a veterinarian visit, the parties would rely on the blood test conducted by the veterinarian." *Scheer Agri-Enters., Inc.*, 2020 WL 7383789, at *2.

---

[1] Topigs owns a "certain genetic strain of swine breeding stock." *Scheer Agri-Enters., Inc. v. Ledger Swine Farms, Inc.*, No. 19-1799, 2020 WL 7383789, at *2 (Iowa Ct. App. Dec. 16, 2020). "Gilts are young female pigs that have not yet been bred." *Id.* at *2 n.3.

The first delivery of gilts took place without issue on December 16, 2017. The second delivery of gilts took place on December 21, but shortly after delivery, the parties learned the gilts were positive for PRRS.[2] Scheer's facility sustained a PRRS outbreak.

Scheer filed a lawsuit against Ledger, raising claims of breach of oral contract, breach of implied warranty, and negligence. Ledger resisted Scheer's claims and raised affirmative defenses. Ledger filed a motion for summary judgment, which the district court granted without hearing.[3]

Scheer appealed. Our court reversed the district court's ruling, finding the court "improperly concluded there could be no showing of an enforceable oral agreement." *Id.* at *9. Specifically, our court noted, "Ledger did not move for

---

[2] We previously explained in detail the facts leading up to the outbreak:

> On December 20, the Ledger facility had its monthly veterinarian visit. The veterinarian drew blood samples and collected the saliva samples for PRRS testing and forwarded the samples to the Iowa State lab.
>
> On December 21, Scheer's truck and driver were scheduled to be in Iowa to deliver weaned pigs raised at [Scheer's] High Gate facility. Scheer proposed to Ledger the second set of gilts could be loaded onto Scheer's truck after that delivery was complete. When Scheer's truck arrived at the Ledger facility, the gilts were loaded and the truck left for Scheer's Missouri facility. Later that day, Ledger's veterinarian called Ledger and orally notified him that the December 20 sample had been read by the laboratory as positive for the presence of PRRS. Ledger called Scheer and told him the pigs had tested positive for PRRS. Scheer advised Ledger the pigs had just been unloaded. The pigs were reloaded onto the truck that same day and were hauled to an isolated area where they were left on the trailer.
>
> The High Gate facility suffered a PRRS outbreak.

*Id.* at *2–3.

[3] The court also denied Scheer's motion to amend its petition to add Topigs as a party, finding the motion "moot" as "Scheer has no live claim against Ledger for which Topigs could be held liable on a vicarious liability theory."

summary judgment on grounds that there was no consideration for the asserted oral contract. Because the court granted summary judgment on a ground not raised—and of which Scheer was given no notice—it erred." *Id.* at *6. Although we "stress[ed] that we are not making any determination on the merits of Scheer's claims," we "agree[d] with Scheer that there remain genuine issues of material fact as to the existence of an oral agreement and whether Ledger breached that agreement," and we remanded for further proceedings. *Id.* at *8–9.

Meanwhile, Scheer filed a separate lawsuit against Topigs, alleging vicarious liability for the acts of Ledger. That action was stayed, pending the resolution of Scheer's appeal. Procedendo issued in Scheer's appeal, and on remand, the district court granted Scheer's motion to consolidate the two cases. Topigs resisted Scheer's claims and raised affirmative defenses. Ledger amended its answer to raise an affirmative defense of lack of consideration for the oral contract alleged by Scheer.

Over the next few years, extensive discovery took place between the parties. Eventually, Topigs filed a cross-petition against Ledger.[4] Topigs also filed a motion for summary judgment, which Scheer resisted. In March 2022, the district court entered an order granting Topigs' motion and dismissing Scheer's claims against Topigs.[5]

---

[4] Topigs raised claims against Ledger for breach of contract, express contractual indemnification, implied contractual indemnification, and equitable indemnification, which Ledger resisted.

[5] The district court further noted "it appears that the court's grant of Topigs' motion for summary judgment may render moot the relief sought in Topigs' cross-petition against Ledger." Topigs later filed a notice of voluntary dismissal without prejudice of its claims against Ledger.

Ledger filed a second motion for summary judgment. In March 2023, the court granted the motion and dismissed Scheer's claims against Ledger.[6] Scheer appeals the court's orders granting summary judgment to Topigs and Ledger. Additional facts will be set forth below as relevant to the issues raised on appeal.

## II. Standard of Review

Our review of a district court ruling granting summary judgment is for correction of errors at law. *Albaugh v. The Reserve*, 930 N.W.2d 676, 682 (Iowa 2019). "Summary judgment is proper when the moving party has shown 'there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Id.* (citation omitted).

## III. Discussion

On appeal, Scheer challenges the court's dismissal of its negligence, breach-of-oral-contract, and breach-of-implied-warranty claims against Ledger. Scheer also challenges the court's dismissal of its vicarious-liability claim against Topigs. We address Scheer's claims in turn.

### A. Negligence

Scheer alleged Ledger owed Scheer "a duty to test the gilts for sale prior to allowing the gilts to be transported to [Scheer]'s farm"; Ledger "breached its duty to [Scheer] when it failed to obtain test results prior to allowing [Scheer] to transport the gilts to [Scheer]'s farm"; Ledger's "breach constitutes negligence"; and "[a]s a result of [Ledger]'s aforesaid negligence, [Scheer] has suffered damage to its property." Specifically, Scheer claimed Ledger was negligent "(a) [b]y failing to

---

[6] The court "incorporate[d] the content of the March 28, 2022 summary judgment ruling" relating to Topigs in its order.

timely test the gilts prior to transport; (b) [b]y failing to timely obtain test results prior to transport[7]; (c) [b]y failing to warn [Scheer] that the test results had not been received; [or] (d) [b]y other negligent acts which may be proven."

Scheer later clarified its "claim for damages is based upon the injury done to [its] existing swine herd—property that is completely separate and distinct from the contracted-for gilts delivered by [Ledger]." According to Scheer, "[t]his is an important distinction because Scheer's existing herd is in no way considered, covered, or contemplated by the waivers and limitations contained in the contract for the sale of [Ledger]'s gilts." Ultimately, the district court found Scheer's negligence claim barred by the economic loss doctrine as well as Section E and Section K of the GSA. Scheer challenges the court's rulings on each of these issues.

*1. GSA*

It is undisputed Walter Scheer, "in his capacity as president of Scheer Agri-Enterprises Inc.," signed the GSA on December 16, 2017,[8] prior to the first delivery of gilts. The following provisions are included in the GSA:

**V. CONDITIONS OF SALE:** The Conditions of Sale, set out below, govern all sales by LSF [(Ledger Swine Farms)] to Customer and Customer's use of products purchased from LSF:
**A. WARRANTIES OF LSF REGARDING THE SALE OF ANIMALS**

---

[7] Insofar as Scheer claims federal law prohibits the shipment of "infected swine," because this claim was not raised or addressed below, we decline to consider it on appeal. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").
[8] Scheer also signed a Ledger Customer & Sales Order Form (Ledger Order Form) that same day, which "specifie[d] the number of pigs to be sold, the price to be paid[,] and some details of the delivery." *Scheer Agri-Enters., Inc.*, 2020 WL 7383789, at *3.

1. Animals supplied under these Conditions of Sale have been inspected and certified in accordance with applicable federal and state animal health regulations.

. . . .

**C. ISOLATION AND ACCLIMATIZATION OF ANIMALS.**

1. Customer will completely isolate all animals in a clean facility, physically separate from other swine for at least thirty (30) days, will follow the recommendations of a licensed veterinarian for isolation and for release of animals after the isolation period, and will not begin acclimatization procedures for thirty (30) days after delivery. LSF encourages Customer to test animals, at Customer's expense, for pathogens or disease that are of concern to Customer while animals are in isolation.

2. Customer will acclimatize animals in a separate facility alongside existing stock for at least thirty (30) days after isolation, and will follow the recommendations of a licensed veterinarian for the release of animals from acclimatization.

Customer agrees and understands that LSF will have no duty to credit Customer for animals due to the presence of infectious agents unless Customer complies with the isolation and acclimatization processes set forth herein.

. . . .

**E. LIMITATION OF LIABILITY.** LSF's liability for losses due to economically significant infectious agents, whether transmitted by or through semen or otherwise, or due to advice and information given by LSF, whether oral or written, or due to LSF's breach of any warranty, or due to any other cause in respect of Animals or Semen will be limited to the credit procedure in the manner provided in Section D (Credits and Procedure). **LSF will not be liable for incidental or consequential damages, including, without limitation, veterinarian's fees, lost profits, loss of anticipated savings, or other incidental or consequential damages of any nature.**

. . . .

**H. DISEASE STATEMENT.** Customer is experienced in swine breeding, and knows that organisms which cause swine diseases (called pathogens) are present in virtually every swine herd, including LSF's swine herds, and in semen. New or different pathogens or diseases may arise at any time (See also LSF's Isolation and Acclimatization recommendations, which identify pathogens for which LSF administers vaccines). The outbreak of diseases however is caused by many factors in addition to the presence of pathogens within an animal, a swine herd, or semen. Although LSF attempts to minimize the presence of pathogens and diseases in its her[d]s and in the swine breeding stock it sells, **LSF CANNOT AND DOES NOT WARRANT THE ABSENCE OF ANY PATHOGENS OR DISEASE IN THE ANIMALS SOLD BY LSF.**

**PATHOGENS OR DISEASES MAY BE PRESENT AT TIME OF SALE OR MAY APPEAR LATER.**

**I. DISCLAIMER OF OTHER WARRANTIES.** This agreement contains all of the warranties made by LSF to Customer. No other warranties, expressed or implied are given. Except as otherwise set out in this Agreement, all animals sold under this Agreement are sold **"AS IS"**. **LSF SPECIFICALLY GIVES NO WARRANTY TO MERCHANTABILITY, HEALTH, OR FITNESS FOR A PARTICULAR PURPOSE EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT.**

LSF specifically disclaims any warranty of the genetic make-up of animals, the performance of animals, or the characteristics or performance of the progeny of animals, except as otherwise set out in this Agreement. **There are no warranties that extend beyond this Agreement.**

. . . .

**K. EXCLUSIVE REMEDY. CUSTOMER'S REMEDY OF CREDIT FOR THE INVOICED COST OF AN ANIMAL, LESS SLAUGHTER VALUE, AS PROVIDED IN SECTION D., "CREDITS AND PROCEDURES," OF THIS AGREEMENT, IS THE EXCLUSIVE REMEDY AGAINST LSF AND TOPIGS NORSVIN FOR ANY CLAIM ARISING OUT OF THE PURCHASE OF ANIMALS FROM LSF BY CUSTOMER. ALL OTHER REMEDIES, WHETHER UNDER STATUTE, REGULATION, CONTRACT, TORT, WARRANTY, NEGLIGENCE, OR ANY OTHER LEGAL THEORY OF ANY NATURE, ARE EXPRESSLY WAIVED BY CUSTOMER. CUSTOMER IS AWARE OF THE RISKS OF SWINE PRODUCTION AND THEREFORE THIS WAIVER IS NEITHER UNREASONABLE NOR UNCONSCIONABLE.**

. . . .

**N. ENTIRE AGREEMENT. THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES REGARDING THE MATTERS CO[V]ERED BY THIS AGREEMENT, AND SUPERSEDES ALL OTHER AGREEMENTS, REPRESENTATIONS, OR NEGOTIATIONS BETWEEN OR BY THE PARTIES HERETO, WHETHER ORAL OR WRITTEN, REGARDING SUCH MATTERS. THIS AGREEMENT MAY NOT BE AMENDED EXCEPT BY A WRITTEN DOCUMENT SIGNED BY BOTH PARTIES. CUSTOMER ACKNOWLEDGES THAT CUSTOMER HAS READ AND UNDERSTANDS THIS AGREEMENT AND ANY SCHEDULES ATTACHED TO THIS AGREEMENT, AND THAT CUSTOMER IS ENTERING INTO THIS AGREEM[ENT] VOLUNTARILY AND NOT IN RELIANCE ON ANY REPRESENTATION OF LSF EXCEPT AS HEREIN PROVIDED.**

**CUSTOMER AGREES, BY SIGNING BELOW, THAT LSF HAS GIVEN CUSTOMER NO PROMISES, WARRANTIES, GUARANTEES, OR REPRESENTATIONS EXCEPT AS**

**SPECIFICALLY STATE[D] IN THIS AGREEMENT. TOPIGS NORSVIN PROVIDES NO WARRANTIES FOR ANY TOPIGS NORSVIN GENETICS ACQUIRED BY CUSTOMER FROM LSF.**

The district court found Scheer's negligence claim barred by Section E and Section K of the GSA. Specifically, the court held:

Even if [Scheer] now is relying on "separate and distinct" damages caused by the delivery of the infected pigs, the Court agrees with Ledger that the GSA specifically contemplates the possibility of the animals being harmed by infectious agents [under Section E], and in such a case, the risk of damages is allocated to the buyer, [Scheer]. Section K of the agreement clearly provides that the contract is the exclusive remedy for any claim arising from the purchase of the pigs.

On appeal, Scheer argues these terms of the GSA are unenforceable and therefore "do not bar Scheer's negligence claim." Specifically, according to Scheer, interpreting Section K of the GSA as a waiver to any claim for damages to Scheer's "barn or the animals contained therein" "would render the agreement unconscionable and therefore unenforceable."[9] "Under Iowa law, a court considering a claim of unconscionability should consider the factors of assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness." *Brunsman v. DeKalb Swine Breeders, Inc.*, 138 F.3d 358, 360 (8th Cir. 1998).

In *Brunsman*, the court considered a claim of unconscionability relating to a contract for the sale of breeding boars. *Id.* at 359. The contract contained provisions for limitations on warranties, remedies, and damages nearly identical to the provisions at issue here. *Id.* (noting the contract "disclaimed any warranty of merchantability, health, or fitness for a particular purpose and limited the buyer's

---

[9] Scheer also claims Sections E and K "are unenforceable due to their failure of essential purpose." However, because this contention was neither raised before nor addressed by the district court, we decline to consider it on appeal. *See Meier*, 641 N.W.2d at 537.

remedy to replacement of the boars"). "The boars allegedly transmitted a virus to the Brunsmans' and Nelsons' sows, causing the sows to give birth to piglets that suffered from 'Shaky Pig Syndrome.'" *Id.* On the plaintiffs' claim of unconscionability, the court determined:

> The question is not a difficult one in this case, since the Brunsmans' and Nelsons' briefs concede that they agreed to the terms and that they were "free to go elsewhere for breeding stock."[10] Thus, the factors of assent and disparity of bargaining power do not help the buyers. There can be no plausible claim of unfair surprise or lack of notice, since the limitation of warranty was in plain language, intelligible to a layman, and was printed in the most emphatic typeface on the front of the contract. Moreover, the front of the contract alerted the buyer to a statement on pathogens expressly stating that DeKalb's herd had been exposed to the virus that the boars were later found to carry. As for substantive unfairness, Iowa Code section 554.2316(2) (1995) permits parties to negate implied warranties if the exclusion meets certain standards, which the contracts in these cases met. The Brunsmans and the Nelsons have made no showing sufficient to establish that the limitations of warranties in their contracts were unconscionable as a matter of law.

*Id.* at 360. The court therefore affirmed the district court's order granting summary judgment in favor of the defendant. *Id.*

Scheer claims the circumstances in *Brunsman* "are readily distinguishable from the case at hand." We disagree. On this issue, the district court found:

> Even when the facts are viewed in the light most favorable to [Scheer], the court finds no genuine issue of material fact on the question of whether the contract is unconscionable. As in *Brunsman*, the limitation of warranty was in plain language, was understandable by a layman, was printed in bold, and the contract itself listed numerous examples of the types of damages that were excluded by the agreement, including veterinarian's fees, lost profits, and loss of

---

[10] Similarly, here, Walter Scheer acknowledged Scheer could have purchased gilts from another source. As he stated, "I would say we were maybe 80 percent certain that we wanted to go with Topigs, but we would have certainly been influenced by something negative that may have crept up, you know, in the health or performance of the Topig animals that we received."

anticipated savings. [Scheer] has not made a showing that would establish that these limitations are unconscionable as a matter of law, including as to questions of assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness.

Finding no error in the court's decision, we affirm on this issue.

### 2. Economic Loss Doctrine

Scheer also challenges the district court's holding that the economic loss doctrine bars Scheer's negligence claim. This rule provides "a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 503 (Iowa 2011) (citation omitted). In other words, "there is no recovery in negligence for pure economic loss, that is, for economic loss unrelated to injury to the person or the property of the plaintiff." *Id.* (citation omitted). The rule is meant to prevent parties litigating in tort what should be litigated in contract where, presumably, the parties "have allocated [expectations of the contractual relationship] between themselves in their contract." *Id.*

The district court found *Determan v. Johnson*, 613 N.W.2d 259 (Iowa 2000) to be instructive on this issue. In *Determan*, defendant homesellers limited their liability via contractual waivers. 613 N.W.2d at 260. The court applied the economic loss rule because there was no link between the defendants and a hazardous collapse; instead, "the plaintiff's claim [wa]s based on her unfulfilled expectations with respect to the quality of the home she purchased." *Id.* at 263. The court specified, "there has been no 'sudden or accidental occurrence'; rather the harm for which the plaintiff seeks to recover 'relates to [the plaintiff's] disappointed expectations due to deterioration, internal breakdown or non-

accidental cause.'"    *Id.* at 264 (quoting *Nelson v. Todd's Ltd.*, 426 N.W.2d 120, 124–25 (Iowa 1988) ("When a buyer loses the benefit of his bargain because the goods are defective . . . he has his contract to look to for remedies. Tort law need not, and should not, enter the picture.")).

Here, the court found "this case is akin to *Determan*, in that only economic harm has been suffered due to Plaintiff's unfulfilled expectations regarding the agreement to purchase the gilts. The case does not involve the types of damages that would support a negligence claim." We find no error in the court's conclusion. *See also Ziel v. Energy Panel Structures, Inc.*, No. 19-0508, 2020 WL 4498064, at *6 (Iowa Ct. App. Aug. 5, 2020) (finding tort claims barred by the economic loss doctrine when there was physical harm to property other than the product itself); *Webb v. Midwest Storm Co.*, No. 19-0041, 2020 WL 1879702, at *2 (Iowa Ct. App. Apr. 15, 2020) (finding the plaintiffs' claims "are contract claims, not negligence claims"). Although Scheer maintains its "claim for damages is based upon the injury done to [Scheer's] existing swine herd—property that is completely separate and distinct from the contracted-for gilts delivered by [Ledger]," and Scheer persists "[t]his is an important distinction because Scheer's existing herd is in no way considered, covered, or contemplated by the waivers and limitations contained in the contract for the sale of [Ledger]'s gilts," the fact remains that Scheer's loss resulted in consequential damages compensable in contract, not tort. *See, e.g.*, *Richards v. Midland Brick Sales Co.*, 551 N.W.2d 649, 651 (Iowa Ct. App. 1996).

Moreover, as we have determined above, the parties' contract terms defeated Scheer's tort claim. *See Calabretto Bldg. Grp. v. Tradesmen Int'l, LLC.*,

No. 22-1184, 2023 WL 7391670, at *6 (Iowa Ct. App. Nov. 8, 2023) ("As we reasoned above, . . . the relevant terms of the client services agreement [are enforceable]. . . . That agreement bars Calabretto's tort claim alleging negligence . . . . Thus, summary judgment for Tradesmen was proper."). We affirm on this issue.

### B.    Breach of Oral Contract

Scheer alleged Ledger and Scheer "orally agreed [Ledger] would test the gilts [Ledger] was seeking to sell to [Scheer]"; "[b]oth parties understood [Ledger] was to test for porcine diseases including the PRRS disease"; "[b]oth parties understood [Ledger] was to test the gilts and obtain test results prior to the transfer of the gilts from [Ledger]'s possession to [Scheer]'s possession"; and "[b]oth parties understood [Scheer] had no desire to purchase gilt pigs that had not been tested for PRRS." Scheer claimed Ledger breached the oral agreement by (a) "failing to timely test the gilts for diseases"; (b) "transferring gilt pigs to [Scheer] without first obtaining the test results"; (c) "failing to tell [Scheer] that the gilts had not been timely tested"; [and/or] (d) "failing to tell [Scheer] that the gilts were being transferred prior to the receipt of the test results." Scheer further claimed, "As a result of [Ledger]'s breach, [Scheer] has suffered and continues to suffer damages" and Scheer was "entitled to recover the full amount of consequential damages incurred as a result of [Ledger]'s breach." The district court granted summary judgment on Scheer's claim on two bases. The court found it was barred by Section N of the GSA and it failed for lack of consideration. Scheer challenges the court's rulings on each of these issues.

*1. Fully Integrated Agreement*

It is undisputed Scheer and Ledger signed two agreements: the GSA (set forth in relevant part above) and the Ledger Order Form (which was incorporated into the GSA).  The Ledger Order Form provides as follows:

## LEDGER SWINE FARMS INC.
### Customer & Sales Order Form
### LIVESTOCK

**Order Type:** Barn Fill ☐     Standing Order ☒     Spot Order ☐

**Source:** Parent Gilts  TN 27 gilts          Terminal Boars

**Customer Billing Information**

**Billing Name:** Scheer Agra Enterprise Inc.

**Billing Address:** 3501 ███████          City  New Haven     State  MO  Zip  63068

**Billing Contact Name:** ███████ Wally Scheer

**Customer Phone Number:** 573-237-3527          **Cell Phone:** 573-680-9172

**Billing Email Address:** whscheer@outlook.com          **Fax Number:**

### Product Description

| Quantity | Male/Female | Line | Type of Boar: AI/NM | Specifications<br>Weight or age of animals required |
|---|---|---|---|---|
| 1050 | Female | TN27 | | 24-26 weeks of age. $230/hd plus delivery or shuttle fee. 350hd/month. Dec, Jan, Feb |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Delivery Schedule: Detail until Significant Change** (e.g. Every 6 weeks starting on Week 1 2017)

**Set date for first delivery:** 12/16/17

**Transportation Requirements**

Shuttle fee of $250.
**Delivery Charge:** Delivery cost.

Customer Requirements:  ☒ Shuttle   ☒ Back up to Barn   ☐ Isolation

Does the transport unit need to bring a ramp for the unload at this location?  ☐ Yes   ☐ No

**Delivery Address** ▮▮▮▮▮▮▮▮  City  St. James          State  MO   Zip  65554

Detailed Delivery Directions

(is special route required?) _____

Barn Contact Person:   Wally Scheer          Home Phone: _____

Barn Phone: _____          Cell Phone: _____

Barn Fax: _____          Barn Email: _____

**Herd Health Information**

Herd Health Status: _____   Herd Size:  3000          **Vet to Vet Required?**  ☒ Yes  ☐ No

Vet Name:  Dr. Patty Homeyer          Vet Email: _____

Clinic Name:  Union Vet Associates          Clinic Phone Number: ▮▮▮▮▮▮

**Vaccinations Required**

☐ HPS for H. Parasuis  OR  ☐ MH/HPS for H. Parasuis and Mycoplasma

☐ Other (please list)

**Pre-Transport Diagnostic Testing** _____

**Pricing**

Pricing for Gilts:   $230/hd plus shuttle or delivery fee.

Additional Comments:   Will coordinate shuttle and delivery schedule.

Require check for payment in full prior to loading or unloading gilts.

Preinvoice will be emailed prior to delivery.

Pricing for Boars: _____

Additional Comments: _____

I, the undersigned, wish to purchase these animals subject to the terms and conditions of sale as has been presented to me by Ledger Swine Farms.

Purchaser Signature: _Wally Scheer_          Date: _12-16-17_

Print Name: _____

Ledger Swine Farms Inc: _Gary Ledger_

It is undisputed the parties understood Scheer was not going to isolate the gilts upon delivery per "protocol," and therefore, the parties discussed the possibility of doing additional testing. Before the agreements were signed, Ledger stated he would "do[ ] oral fluids testing of the weeks that we were going to ship

gilts to Mr. Scheer if it was opposite of where we were not having the vet bleed." Neither agreement contained provisions relating to oral fluids testing. Indeed, the Ledger Order Form has a space for "Pre-Transport Diagnostic Testing," which was left blank.

The GSA, however, "contained strict language regarding limitations of liability, warranties, remedies, and, as noted, an integration clause." *Scheer Agri-Enters., Inc.*, 2020 WL 7383789, at *10 (Greer, J., concurring in part and dissenting in part). The integration clause contained in Section N stated the GSA (and Ledger Order Form) "constitutes the entire agreement of the parties regarding the matters co[v]ered by this agreement" and it "supersedes all other agreements, representations, or negotiations between or by the parties hereto, whether oral or written, regarding such matters." *Cf. Cannon v. Bodensteiner Implement Co.*, 903 N.W.2d 322, 328–29 (Iowa 2017) ("The presence of an integration clause is one factor we take into account in determining whether an agreement is fully integrated." (citation omitted)).

Scheer testified he read and understood the agreements before he signed. Specifically, Scheer stated:

> Q. All right. You agree you had a chance to read it? A. Uh-huh. Yes.
> Q. All right. Since this dispute has come up, have you read it? A. Yes. It hasn't changed.
> Q. No, I understand that. I was going to ask you, when you read it at any time, was there any part of it that you read it and said I don't know what that means? A. No.
> Q. You feel like you understood it? A. Yeah, I understood it. It was standard. It was standard industry warble.
> Q. When you say warble, did you understand you were agreeing to the terms of that when you took delivery of those pigs? A. Yes.
> . . . .

> Q. Just above your signature it says, quote, I, the undersigned, wish to purchase these animals subject to the terms and conditions of sale as has been presented to me by Ledger Swine Farms. Did you understand that the genetic supply agreement was part of the terms? A. Yes.

There is no question the parties were experienced in the pig breeding industry and aware of the risks associated with porcine pathogens and diseases. The Ledger Order Form set forth "herd health information" and provided details about delivery. "Despite the 'standard industry warble,'" Scheer signed the agreements, "admitting he had to before Ledger would give him pigs." *Scheer Agri-Enters., Inc.*, 2020 WL 7383789, at *11 (Greer, J., concurring in part and dissenting in part). Moreover, as Ledger accurately points out, "Ledger agreed to test[, but t]he parties never agreed to withhold shipments until test results were in hand," and the timing of the deliveries were up to Scheer. On this issue, the district court found "extensive discovery has taken place since the Court of Appeals entered its opinion, and the record has been developed beyond what it was when [the district court] entered summary judgment." We agree with the district court that Scheer "has offered no specific evidentiary fact to show a genuine issue of material fact on the question of integration." *Cf. Cannon*, 903 N.W.2d at 328 ("Determining whether an agreement is fully integrated is a question of fact, to be determined from the totality of the evidence." (citation omitted)).

In a fully integrated agreement, a party may not use extrinsic evidence, such as a prior oral agreement, "solely to vary, add to, or subtract from the agreement." *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 85 (Iowa 2011); *see Montgomery Props. Corp. v. Econ. Forms Corp.*, 305 N.W.2d 470, 475–76 (Iowa 1981) (holding "where the handcrafted contract contains an integration

clause, where the parties were sophisticated business persons represented by counsel and of equal bargaining strength, and where terms of the alleged oral agreement reasonably would be expected to be included in the exchange agreement," there was no error when court sustained a parol evidence rule objection and excluded evidence to vary the contract's terms); *see generally* Iowa Code § 554.2202 (2017) (setting forth the parol evidence rule).

As the district court found:

> Even when the facts are considered in the light most favorable to [Scheer], the court concludes there are no genuine issues of fact on the question of whether the integration clause in the agreement prohibits [Scheer] from relying on any oral agreement to create additional contractual terms between the parties, and as to whether any consideration existed to create a verbal contract. . . .
> . . . . The court is persuaded that the undisputed facts show that the GSA is a fully integrated document to which oral terms cannot be added to vary or subtract from the GSA. . . . The contractual language is clear regarding the full extent of the parties' agreement, and prohibits [Scheer] from stating a claim based on any additional oral terms not included in the GSA.

Finding no error in the court's ruling, we affirm on this issue.[11]

### 2. Lack of Consideration

A valid contract requires an offer, acceptance, and consideration. *Margeson v. Artis*, 776 N.W.2d 652, 655 (Iowa 2009).

> Generally, the element of consideration ensures the promise sought to be enforced was bargained for and given in exchange for a reciprocal promise or an act. Thus, a promise made by one party to a contract normally cannot be enforced by the other party to the contract unless the party to whom the promise was made provided some promise or performance in exchange for the promise sought to be enforced. In other words, if the promisor did not seek anything in exchange for the promise made or if the promisor sought something

---

[11] Insofar as Scheer claims the district court "failed to consider usage of trade" and "failed to consider course of performance" relating to this claim, we find Scheer failed to preserve error on these specific issues. *See Meier*, 641 N.W.2d at 537.

the law does not value as consideration, the promise made by the promisor is unenforceable due to the absence of consideration.

*Id.* at 655–56 (internal citation omitted). "A lack of consideration means no contract is ever formed." *Johnson v. Dodgen*, 451 N.W.2d 168, 172 (Iowa 1990).

It is undisputed there was no consideration for Ledger's oral agreement to conduct testing, but Scheer claims it "would not have signed the GSA but for Ledger's offer to conduct additional testing." In other words, Scheer claims there was no consideration because Ledger had a preexisting duty under the written agreements. However, "[w]e look for consideration from the language in the contract and by 'what the parties contemplated at the time the instrument was executed.'" *Margeson*, 776 N.W.2d at 656 (citation omitted). On this issue, the district court found:

> [E]ven when the facts are viewed in the light most favorable to [Scheer], there is no genuine issue of material fact on the question of whether there was any consideration for the contract [Scheer] claims exists. Mr. Ledger's second deposition establishes that [Scheer] asked Ledger to test the gilts for PRRS before shipment, and Mr. Ledger said "okay." (["]Q: So he just asked you to do it and you said okay? A: Yes."). There was no benefit or return promise to Ledger, and thus the contract claimed by [Scheer] is missing the essential element of consideration. [Scheer] has offered no specific evidentiary fact showing a genuine issue of material fact on the question of consideration for the contract. The court notes that [Scheer] has argued that consideration exists in the form of [Scheer]'s agreement to purchase the gilts, but, as Ledger has argued, this verbal agreement was not integrated into the parties' written agreement. Further, the court does not view [Scheer]'s agreement that the additional testing would occur as consideration, since the undisputed facts show that [Scheer] asked for the additional testing, and Mr. Ledger responded "okay." As compared to the appeal of [the district court's prior summary judgment] ruling, Ledger now clearly has pled lack of consideration as an affirmative defense [and Scheer] has received adequate notice of Ledger's reliance on the affirmative defense of lack of consideration, both in the pleadings and through the appeal process. Because there is a

lack of consideration, a verbal contract was not formed between [Scheer] and Ledger.

Finding no error in the court's ruling, we affirm on this issue.

### C.  Breach of Implied Warranty

Scheer alleged, "By signaling to [Scheer] that the gilt pigs were available for pick up and transport on December 21, 2017, [Ledger] impliedly warranted that the gilts had been tested for PRRS and that the test results had confirmed the gilts did not contain porcine diseases, including b[ut] not limited to PRRS" and Ledger "breached the implied warranty made to [Scheer], causing [Scheer] to sustain damages."  Scheer claimed it therefore was "entitled to recover all actual, incidental, and consequential damages that flow directly and in a foreseeable fashion from [Ledger]'s breach."

In granting summary judgment in favor of the defendants, the district court did not expressly address this claim.  On appeal, Scheer claims "the district court committed reversible error" by failing to "address Scheer's breach of implied warranty claim."  "When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal."  *Meier*, 641 N.W.2d at 537.  Accordingly, this claim is not preserved.

### D.  Vicarious Liability

As noted above, Scheer filed a separate action against Topigs, alleging Topigs was vicariously liable for the same claims raised against Ledger.  The

district court entered summary judgment in favor of Topigs. On appeal, Scheer challenges the court's findings that Ledger was not acting as Topigs' agent.[12]

At the outset, we observe our findings above essentially preclude Scheer's claims against Topigs. *See, e.g.*, *Hook v. Trevino*, 839 N.W.2d 434, 441 (Iowa 2013) (noting "an adjudication that the agent was not negligent will preclude the principal's vicarious liability"). We therefore affirm the court's order granting summary judgment on those claims. However, we reiterate the following sound analysis by the court with respect to the alleged agency relationship between Ledger and Topigs:

> Even when the facts are viewed in the light most favorable to [Scheer], the court concludes there are no genuine issues of material fact on the question of whether Ledger was acting as Topigs' agent with respect to the sale of the gilts. In his second deposition testimony, Mr. Scheer admitted that Ledger owned the gilts, and was selling them to [Scheer]. Mr. Ledger also admitted [Scheer] was purchasing the gilts from Ledger, not Topigs. Thus, there was nothing for which Ledger could act on behalf of Topigs. Even if Ledger could have acted for Topigs, Mr. Ledger testified in his most recent deposition that he was acting on his own behalf in the sale of the gilts to [Scheer]. Further, [Scheer] has not set forth any specific evidentiary fact showing the existence of a genuine issue of material fact on the question of whether Topigs took any actions to utilize Ledger in an agency relationship. Rather, [Scheer] relies on mere allegations that Ledger was acting for Topigs, without identifying any specific actions or statements from Topigs that would create an agency relationship with Ledger. [Scheer] relies on a separate agreement between Topigs and Ledger, the "Agency and Topigs Norsvin Genetics Grow-Out Agreement," as a basis for the court to find a fact question on whether Ledger was acting as Topigs' agent. However, as Topigs points out, [Scheer]'s own discovery responses indicate that [Scheer] was not aware of this agreement until after this action was filed. This negates any argument that [Scheer] believed

---

[12] Scheer also claims the court erred in finding its claims against Topigs were released by a January 2018 gilt purchase agreement and an October 2018 settlement and challenges the court's statement relating to the statute of limitations set forth in Iowa Code section 554.2719. In light of our review and disposition of the other issues raised on appeal, we need to reach these alternative claims.

Ledger to have apparent authority to act for Topigs *at the time* the transaction between [Scheer] and Ledger. Ledger was not acting as Topigs' agent with respect to the sale of the gilts, and [Scheer] cannot succeed on its vicarious liability claim against Topigs.

## IV. Conclusion

In sum, we affirm the district court's orders granting summary judgment in favor of Ledger and Topigs and dismissing Scheer's claims of negligence, breach of contract, breach of implied warranty, and vicarious liability.

**AFFIRMED.**